THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JAMES JACKSON, Respondent.

First Department, January 3, 1980

## APPEARANCES OF COUNSEL

*Norman A. Bloch* of counsel *(Jerrold L. Neugarten* with him on the brief; *Robert M. Morgenthau, District Attorney)*, for appellant.

*Vincent A. Apicella* of counsel *(Phillip R. Kaufman* with him on the brief; *Apicella & Schlesinger,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

At approximately 11:45 P.M. on December 21, 1977, Wayne Batts approached Police Officer McGoldrick and Detective Grimes in the 28th precinct station house, and stated that a man had earlier that day fired three shots at him. Batts also said that he believed that his assailant, whom he knew, could be found in a apartment at 173 West 126th Street. Taking Batts with them, the officers, accompanied by fellow anticrime Officers Mesh and Lack, proceeded to that address. When they arrived Batts said he thought his attacker was in the basement apartment, the entrance to which was beneath the front stoop and two steps down from the sidewalk.

After knocking on the door, the officers were admitted by a Ms. Dillard, who, it was later determined, resided in the apartment, and was the girlfriend of Batts, as well as defendant's former wife. A number of other people were also in the apartment. While Detective Grimes was speaking with Ms. Dillard, a pay telephone in the rear of the apartment began to ring. Officer McGoldrick picked up the receiver and, without identifying himself, said "hello." The caller, a male, asked what was going on in the apartment, and also "asked for" several individuals. According to McGoldrick, the caller became "very loud and boisterous", shouted that "he was going to come over and shoot me and blow my head off", and then hung up, without identifying himself.

After reporting the threat to the other officers, McGoldrick left the apartment with Detective Grimes and the two men positioned themselves directly across the street from 173 West

126th Street. It was now past midnight. No other cars were parked in front of the building or in the immediate vicinity.

Approximately 10 minutes later a car pulled up in front of 173 West 126th Street and came to an "abrupt" stop. The sole occupant, defendant, got out and walked toward the entrance to the basement apartment. McGoldrick and Grimes, with guns drawn, approached defendant from behind and identified themselves. Defendant stopped as he neared the steps leading to the door of the basement apartment, and turned toward them. McGoldrick stood back and covered Grimes, who walked up to defendant and asked him if he had a gun. Defendant said "yes." Reflexively, his hand moved toward his right leg. Grimes grabbed defendant's right front pants pocket, felt a gun, and removed it. While the officers handcuffed defendant, Batts and Officers Mesh and Lack exited the apartment and Batts identified defendant as his assailant.

■ Holding that the search could be justified only if it was incidental to a lawful arrest, the trial court granted defendant's motion to suppress because the arrest was not made until after the search and at the time of the seizure "there was no probable cause to arrest the defendant." We find that the police acted reasonably in stopping defendant and asking him whether he had a gun, and in subsequently seizing the gun which he admittedly possessed. Accordingly, we would reverse.

■ Preliminarily, we note that our decision, based, as it is, on the police officers' testimony, presumes that the suppression court credited their testimony, although the court did not make any factual finding to that effect, as is required. (See CPL 710.60, subds 4, 6.) We are empowered to consider and determine the question of the officers' veracity. (See CPL 470.15, subd 1; also *People v Davis,* 51 AD2d 531.) In the absence of any challenge to their credibility, either in the court's summary of the testimony, or in defendant's arguments during the hearing, we credit their testimony.

■ ■ A seizure does not, *ipso facto,* constitute an arrest. (See *Terry v Ohio,* 392 US 1; *Dunaway v New York,* 442 US 200.) There are three levels of justifiable police intrusion upon a citizen in a public place, short of an arrest, each in itself a form of seizure in which the person's liberty of movement is significantly interrupted. At the first level a police officer may approach for the purpose of requesting information; at the second and more intense level

he has the common-law right to inquire, which is "activated by a founded suspicion that criminal activity is afoot"; and at the third he has the statutory right to forcibly stop and detain a person when he entertains a reasonable suspicion that the person has committed, is committing, or is about to commit a felony or misdemeanor. (See *People v Santiago,* 64 AD2d 355, citing, generally, *People v De Bour,* 40 NY2d 210.) Ancillary to the statutory right to detain is the officer's authority to frisk if he reasonably suspects that he is in danger of physical injury. (CPL 140.50, subd 3.) Whether a particular seizure is reasonable "requires weighing the government's interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security. * * * In conducting this inquiry we must consider whether * * * the action of the police was justified at its inception and * * * reasonably related in scope to the circumstances which rendered its initiation permissible." *(People v Cantor,* 36 NY2d 106, 111, and citations therein.) "[T]he predicate established defines the scope of permissible police conduct." *(People v Stewart,* 41 NY2d 65, 66.)

■ With these principles established, it seems clear that when the driver exited his car and headed directly to the entrance to the basement apartment, the officers had the right to approach and inquire as to his activities. They were investigating an assault with a firearm. They had gone to the Dillard apartment on information provided by the victim, who had accompanied them, not on the basis of any anonymous tip. (Cf. *People v Stewart, supra.)* Officer McGoldrick had himself been threatened by a telephone caller, who stated that "he was going to come over and shoot me and blow my head off." The proximity in time of the phone call to defendant's arrival, accented by his abrupt stop in front of the apartment house at 12:30 in the morning, would have been interpreted as more than a coincidence by even the most casual observer. For the officers to delay their investigation until the driver was in the apartment before taking precautionary measures would have bordered on malfeasance.

When the officers did approach defendant his answer to Grimes' inquiry as to whether he had a gun and the instinctive movement of his hand to his pants pocket confirmed the officers' suspicions and justified the frisk. "[W]here reliable information or facts available to the police officer link the

individual to a weapon, the belief of danger to himself and others is real and reasonable and an immediate search is justifiable." *(People v Moore,* 32 NY2d 67, 70; see, also, CPL 140.50, subd 3.)

Of course, even before asking any question the officers had already drawn their guns. Although the right to stop for purposes of investigation, whether common law or statutory, does not give rise to a right to effect the same at gunpoint, the situation confronting the officers dictated the exercise of the utmost caution to secure not only their own safety but the safety of the occupants of the basement apartment as well. Mindful that someone had shot at Batts, and that Batts' attacker had a connection to the Dillard apartment, and with the telephone caller's threat fresh in their minds, the officers were justified in approaching with guns drawn. Had they proceeded otherwise the response to their inquiry might well have been expressed in an act of violence. (See *People v Rivera,* 14 NY2d 441.) Since "we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty." *(People v Rivera, supra,* p 446.)

As already noted, at the point defendant was asked whether he had a gun the officers had already drawn their guns, and defendant had actually been deprived of his liberty. In such circumstances, "under *Miranda,* he may no longer be questioned without first being warned of his rights, and any statement elicited without such warnings may not be received in evidence, or otherwise used, at a subsequent trial." *(People v Shivers,* 21 NY2d 118, 122.) We do not believe, however, that the single question directed to defendant constituted an interrogation to which the *Miranda* warnings are applicable. (See *People v Huffman,* 41 NY2d 29, 33, 34.)

Moreover, we find that, under the circumstances, the officers would have been empowered to frisk defendant without any action on his part, so that the gun would have been discovered in any event. (See *People v Chestnut,* 69 AD2d 41, 49; also CPL 140.50, subd 3.) "[E]vidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence." *(People v Fitzpa-*

*trick,* 31 NY2d 499, 506; see, also, *United States v Seohnlein,* 423 F2d 1051, cert den 399 US 913; *People v Reisman,* 29 NY2d 278.)

Accordingly, the order, Supreme Court, New York County (DICKENS, J.), entered April 14, 1978, granting defendant's motion to suppress a gun, should be reversed, on the law, and the motion to suppress denied.

MURPHY, P. J., KUPFERMAN, FEIN and Ross, JJ., concur.

Order, Supreme Court, New York County, entered on April 14, 1978, reversed, on the law, and the motion to suppress denied.