THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
GREGORY VALDEZ and WILLIAM BEEDLES, Respondents.

First Department, January 22, 1981

### APPEARANCES OF COUNSEL

*Victoria Lea Smith* of counsel *(Allen Alpert* with her
on the brief; *Robert M. Morgenthau, District Attorney,*
attorney), for appellant.

*Laurence Jacobson* for Gregory Valdez, respondent.

*Melvin B. Zahler* of counsel *(William E. Hellerstein,* at-
torney), for William Beedles, respondent.

### OPINION OF THE COURT

SULLIVAN, J.

At issue is whether Trial Term properly suppressed vari-
ous articles of physical evidence and defendants' statements
as the product of an arrest for which probable cause was
lacking.

The account of events leading to the arrest was adduced at the suppression hearing. On April 18, 1979, at approximately 10:00 P.M., undercover Officers Mahoney, Zackman and Flynn were driving an unmarked car north on Third Avenue when Officer Mahoney noticed defendants Gregory Valdez and William Beedles on Ninth Street "lurking" near a doorway situated about 70 yards east of Third Avenue. East Ninth Street between Second and Third Avenues is lined with commercial buildings. Except for an occasional night light, the lights were out in all the stores on the street and the protective gates drawn. Officer Mahoney, who had "worked the area a long time", knew that sidewalk gratings which covered shaftways leading to basements abutted the building line of all of the stores on the block. The officers made a U-turn and parked their car on the northwest corner of the intersection, from which they could observe defendants' activities.

Defendants, "disheveled", stood opposite each other, one leaning against a car and the other inside a doorwell. They traded positions intermittently and eyed passing pedestrians. Officer Zackman testified that defendants' conduct led him to believe they were intent on robbing a pedestrian. Approximately 10 minutes after the officers first noticed them, defendants moved to the front of a building at 212 East Ninth Street. Mahoney also knew that this building contained a basement storage room. Piles of garbage, however, blocked the officers' view of the grating* in front of the building.

After several minutes Beedles walked over to the building line and "seem[ed] to disappear into the sidewalk" while Valdez remained at sidewalk level, looking up and down the street. Although Officer Mahoney could not see if the grating had been opened, he believed that Beedles had descended the stairs of the shaftway to the basement. Beedles reappeared after about five minutes, and the two men walked in the direction of Third Avenue. When they reached the corner, a marked police car entered the street

---

* Although this basement entranceway was repeatedly referred to as a grating, it was later determined to be a door, consisting of two horizontal metal panels which, when closed, lay flush with the sidewalk.

and defendants paused and ceased talking. After the car left the block they reversed their direction, but walked past 212 East Ninth Street as a second marked car entered the block. As soon as it had driven away, defendants again walked back to the building, and crossed over to the north side of the street. A third radio car came down the street, and after it left the block the men hurriedly recrossed the street to 212 East Ninth Street.

Once again Beedles disappeared from view, while Valdez, looking up and down the street, remained on the sidewalk. After about a minute the officers saw Beedles handing up two sealed cardboard crates to Valdez, who, carrying the crates, walked about 10 feet westerly in the direction of Third Avenue and then stopped. When Beedles again disappeared into the shaftway, the officers "headed over there" in their vehicle.

As the officers pulled up in front of the building the car's siren was accidentally activated, prompting both defendants to look in their direction. Beedles, with one foot on the stairway and one foot on the sidewalk, was holding three boxes in his hands. Officer Mahoney observed that two of the boxes were labeled "Starkist Tuna Fish" and appeared to be sealed.

Displaying their shields, the officers emerged from their car and identified themselves. Officer Zackman had his gun drawn. Beedles dropped the three boxes to the sidewalk and began to walk away in the opposite direction from Valdez who, on seeing the officers, placed the two boxes he was carrying on a garbage pail. At that point the officers advised defendants that they were under arrest, to which Beedles responded, "You ain't got us for nothing." The arrest took place at approximately 10:30 P.M.

The officers found that the grating in front of the building had been pulled open. A stairway led to an unlighted basement storage room in which crates of foodstuff were stacked. The crates which defendants had been carrying were examined. Four contained cans of tuna fish, the other paper cups.

Defendants were taken to the precinct where they were advised of their constitutional rights. Neither was ques-

tioned, however. In searching Beedles the officers found a meat cleaver inside his boot. Later, as defendants were seated together in a room with Officer Flynn, who was occupied with paper work, Officer Zackman, standing in the hallway outside the room, overhead Valdez say to Beedles, "Man, it's okay, my brother-in-law is the manager".

The court credited the officers' testimony but, finding that defendants' conduct at the time of the officers' approach justified no more than the minimal level of intrusion, i.e., asking questions to elicit information, suppressed the boxes and the meat cleaver, as well as the statements made on the street and at the precinct. Noting that the officers had no reason to suspect that defendants were armed or posed a danger to the officers' safety, the court held that their approach with a gun drawn constituted an arrest and that defendants' relinquishment of the crates was a direct consequence of the illegal arrest, not an abandonment. Thus, the physical evidence was suppressed as the fruit of an illegal arrest. The statements, although found to be voluntarily and spontaneously made, were suppressed as impermissibly tainted by the illegality of the arrest.

Phrases of art like probable cause, reasonable suspicion, minimum level of intrusion, and stop and frisk are so much a part of the legal lexicon that by now one would have expected the development of a body of decisional law encapsulating into appropriate niches a constitutionally sanctioned course of conduct for the myriad of street situations in which police officers find themselves. Unfortunately, however, for even the dispassionate court sitting in review long after the event, the determination as to what constitutes a proper police response does not always readily lend itself to resolution. And for the police officer confronted with the exigencies of a street encounter time is a luxury hardly ever available. As here, he is often called upon to make split-second decisions affecting lives and property.

We find that the police officers acted properly. On the basis of their general knowledge and experience and the events transpiring in their presence, they had probable

cause to believe that defendants were engaged in the burglary of a basement storage room. "Probable cause exists if the facts and circumstances known to the arresting officer warrant a prudent man in believing that the offense has been committed". *(People v Oden,* 36 NY2d 382, 384.)

The officers observed defendants for a period of almost half an hour at night, on a street where no businesses were open, and no residential buildings which they might be visiting were located. During that time defendants were observed engaging in a pattern of furtive behavior which would justify even an untrained observer's belief that criminal activity was in the making. They traversed the block a couple of times, and retreated, changed direction or paused three times when patrol cars entered the block. At all times, the focus of their activity was the building at 212 East Ninth Street and, particularly, the basement.

Officer Mahoney testified that he had been in the precinct nine years and knew that the building contained a storage room in the basement. He was sufficiently familiar with the particular street to know that all of the commercial buildings had sidewalk entrances to their basements. While the suppression court noted that the officers never observed any lock being broken, Mahoney testified that he knew the grating covering the sidewalk entrance to the basement was usually locked and that the building was closed for the night. Thus, even though a pile of garbage obscured his view of the sidewalk grating, Mahoney fairly inferred that when Beedles disappeared entirely from view he had opened the grating and descended into the basement and, when he emerged and was seen handing up two boxes to Valdez on the sidewalk, that the boxes had come from the basement supply room.

That the officers had never seen defendants break open the grating does not detract from the reasonableness of their belief that Beedles had surreptitiously entered the basement of a building closed for business, and removed property. While proof of a breaking without authority is essential to a burglary conviction, police officers are not required to gather specific evidence of each element of a crime before acting on their observations. *(Draper v United*

*States*, 358 US 307, 311-312, citing *Brinegar v United States*, 338 US 160, 172-173.) "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *(Brinegar v United States, supra,* at p 175.)

Defendants argue that the police officers saw no more than Beedles disappearing into a pile of garbage and emerging with some boxes, a sight not uncommon in an area near the Bowery. But when examined on this point Officer Zackman was adamant that the suspects did not look like "Bowery" types rummaging through garbage and that the boxes did not come from the garbage pile, because he was able to see that Beedles was standing beneath the sidewalk level handing them up to Valdez.

Inasmuch as defendants' behavior throughout the half-hour period of surveillance was suspicious, the officers would have been justified at any point in approaching them for the purpose of obtaining an explanation of their conduct. *(People v De Bour,* 40 NY2d 210, 223; *People v Cantor,* 36 NY2d 106, 114.) Of course, such an approach might not have confirmed the commission of a crime. Thus, the officers maintained their watch in the conviction that defendants were intent on committing a crime. Only after Beedles had emerged from the usually closed basement entrance with cartons which he gave to Valdez did the officers approach. By the time they exited their vehicle Beedles had emerged a third time, carrying more cartons which they could plainly see were sealed and contained cans of tuna fish. At that point their suspicions had ripened into probable cause, and defendants' arrest was justified. Additional support for intrusive police action may "be provided by factors rapidly developing or observed at the scene." (See *People v Benjamin,* 51 NY2d 267, 270.)

In our view the facts disclosed present an illustration of effective police work culminating in an arrest after defendants were caught "red-handed" in the commission of a burglary. Consequently, the seized physical evidence and

statements were not obtained by exploitation of an illegal arrest.

Accordingly, the order, Supreme Court, New York Couny (KLEIMAN, J.), entered November 8, 1979, granting defendants' motion to suppress statements and various items of physical evidence should be reversed, on the law, the motion denied, and the matter remanded for further proceedings.

BIRNS, J. P., SANDLER, MARKEWICH and SILVERMAN, JJ., concur.

Order, Supreme Court, New York County, entered on November 8, 1979, reversed, on the law, the motion denied, and the matter remanded for further proceedings.