THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
VICENTE ALBA, Respondent.

First Department, June 25, 1981

##### APPEARANCES OF COUNSEL

*Alan D. Marrus* of counsel *(Mario Merola, District At-
torney,* attorney), for appellant.

*William M. Kunstler* for respondent.

*Richard Emery* and *Steven R. Shapiro* for New York
Civil Liberties Union, et al., *amici curiæ.*

##### OPINION OF THE COURT

MARKEWICH, J.

This case involves the propriety of an order, made after
a hearing, suppressing a handgun found on defendant's
person in a courthouse (104 Misc 2d 1095). All testimony
came from People's witnesses; defendant-respondent pre-
sented none.

On a Sunday evening in March, 1978 defendant, accompanied by four persons, entered the arraignment part of Bronx Criminal Court, about one hour before closing time, carrying a large attaché case, and sat in the last row, apart from his companions. In the three years that the courthouse had been open, there had been several bomb threats phoned in anonymously and, in consequence, a large sign had been placed at the building's outer door, with similar signs at courtroom doors, which warned that all persons entering would be subject to search. The desk inside the main door not being manned on weekends, the duty of implementation of the warning devolved upon courtroom personnel.

Defendent was known by sight to the two court officers and to the Assistant District Attorney on duty, and they promptly conferred to share their knowledge, some derived from newspapers, some from observation. They believed him to be an activist demonstrator, with apparent great influence over other demonstrators, particularly in behalf of Puerto Rican independence as a member of a notorious terrorist organization, FALN, who also had been involved in a case concerned with an arms cache. They decided that it would be appropriate in the circumstances to ascertain whether there was anything in defendant's attaché case which might constitute a danger to the three score or so people in the room.

Rather than risk a confrontation before the people in the courtroom, they arranged a recess and followed defendant and his companions into the corridor. One of the officers approached defendant and requested: "Please step into the clerk's office. I want to search your bag." In a loud voice, defendant replied, "No. You're not." The officer insisted, and defendant said, "No, you can't search my bag if I am not under arrest. Am I under arrest?" The officer told him he was not, whereupon defendant repeated his refusal to have the bag examined. Things became more acrimonious, and the officer then stated, "All right, then you are under arrest." As the officer explained in his testimony, he had no intention whatever of arresting defendant but wished to defuse the building tension in the corridor and move the confrontation into the clerk's office. The officer then reached

for the bag; defendant attempted to pass it out of reach of the officer to one of his friends, but it was then intercepted by the other officer,[1] and the participants moved into the clerk's office.

Defendant and his friends were instructed to put their hands on the counter; defendant, despite this instruction, moved his hands to his midsection and, triggered by this, the officer repeated his instruction and, as he explained in his testimony, fearing he might be shot while examining the bag, patted defendant down. (See CPL 140.50.) He found a loaded handgun inside defendant's clothing. It was given to the clerk, who inquired, "Why are you bringing something like this here?" Defendant replied: "What's the matter? FALN can't come into court any more."

It is defendant's theory, adopted by the suppression court, that defendant was placed under arrest in the corridor without probable cause, after he had refused to submit to an unlawful search, that the arrest was a pretext to permit a search incident thereto, and that the gun, "fruit of a poisoned tree," must be suppressed. We do not agree. There is no quarrel here concerning the state of the record which was certified by stipulation: the transcript presents the facts as seen by one set of witnesses, and there is no argument that the presentation by them is other than accurate. Our only difference is as to the meaning to be adduced from these facts. In re-examining them, we therefore do not invade the province of the sole trier of the fact as to credibility judgments because there were none to be made. But we do not adopt all of the court's findings and conclusions, i.e., the ultimate meaning of the facts and the legal consequences flowing therefrom. Accordingly, we affirm only those findings and conclusions which are consonant with what is here written, and we deem substituted appropriate findings and conclusions therefor.

---

1. The bag was not opened until after defendant's actual arrest a few minutes later on the gun charge, after colloquy with defendant who, amusedly, assured the court officer that there was nothing explosive in it. It actually contained nothing of moment. Had the court officer's original request in the corridor been acceded to, that would have been the end of the episode. One is caused to wonder, considering all the circumstances, whether defendant's conduct was a deliberate, challenging piece of provocation to embarrass the officers.

Lawyers have a predilection to give a dictionary meaning to words. Because the word "arrest" was employed both by defendant and the court officers conducting an inquiry, it is apparently the view of our dissenters, agreeing with the suppression court, that the brief detainer of defendant was actually an arrest, i.e., a seizure by force of defendant and a complete restrainer of his activity. Not so. Dictionary meanings apply to a written document or an oral statement not accompanied by inconsistent conduct. Believing with the great HOLMES that "a word is the skin of a living thought," we examine the accompanying conduct. The officer's statement "All right, then you're under arrest." was no more than an expedient effort to terminate the corridor scene, to defuse the heightening tension, and to move the confrontation away from the crowd into the comparative quiet of the clerk's office. None of the indicia of an actual arrest was present. Defendant was not restrained by handcuffs or otherwise. Far from that, when his condition for examination was met by the officer's pronouncement of the magic word "arrest", he did not comply but launched into his version of a child's game usually played, not with an attaché case, but with a ball. Nor was the case then opened, but all moved into the clerk's officer, and no restraint was there exercised except that hands be kept in view on the counter. Nor did anything further happen until defendant made the alarming gesture toward his waist.

There was no occasion for an arrest; it was not called for by anything that happened up to then. But there was probable cause for an inquiry into what defendant had in the bag, and it was the duty of the court officers in the exigent circumstances, reasonably believing what they did believe, to pursue an inquiry and to detain defendant therefor. (Cf. *United States v Crews*, 445 US 463.) All of the surrounding circumstances entered into their decision. (See *People v McRay*, 51 NY2d 594, 604; *People v Rosemond*, 26 NY2d 101, 105.)

On the basis of their information at the moment, the two court officers took counsel with each other and with a public legal officer and decided on a reasonable basis that there was a serious risk that a known member of a group, which had been consistently described as terrorist, was in a

courtroom when a skeleton force was on hand, amongst some 60 spectators, carrying an attaché case containing some unknown object, that this person had entered a court building and a courtroom past two signs warning of possibility of search, and therefore that, in the interest of public safety, it was necessary to inquire further lest there be damage or injury or both. This summation of available information cannot be brushed away by expressions like "gossamer." Since probable cause to do anything at all is a matter of the mind, these reasons to inquire further, considering the person central to the episode, were as real as the "profile" spoken of in *United States v Mendenhall* (446 US 544). The picture in the officers' minds *was* a profile of defendant. And therefore there was a reason for further inquiry.

It was necessary to know at least whether the case that defendant carried contained anything lethal. At that moment, surrounded by a number of people, mostly unknown, in a courtroom corridor, the less fuss made, the better. The officers were not seeking a public scene, but trying to make an inquiry with a single purpose, to ascertain if danger lurked in the bag. They were trying to do it quietly and without arousing animosity. They knew that the danger was exigent, immediate, without time for the niceties of a warrant. They knew that in the charged atmosphere anything might happen, to the extent of riot. They believed, not without reason, that defendant, having passed two warning signs and continuing into the courtroom, had impliedly consented to have his case examined and, seeking to remove the center of difficulty into a quiet spot, they asked defendant to step into the clerk's office to have his bag examined. They were painstakingly polite and minimally intrusive.

It is well to pause here and consider the effect of the warning signs. In terms of practical effect they are not functionally different from those in an airport warning of the search there required, and both sorts of warnings are posted for the same obvious reason.

It is argued that the officers' conduct was unreasonable in that defendant was given no choice to leave the building.

However, he never requested that opportunity. The same argument was raised and found to be without merit in the leading airport case, *People v Kuhn* (33 NY2d 203, 208-209). Nor is the analogy to airports entirely apt. Here, one need not enter the courtroom or even the courthouse; defendant *was* in, without examination, whereas, in an airport, a would be passenger cannot pass the entrance magnetometer at all without examination. Both the courthouse signs and those at the airport represent the balancing of State and individual interests described in *Terry v Ohio* (392 US 1), *People v Cantor* (36 NY2d 106), and *People v Kuhn* (33 NY2d 203, *supra*).

The officers had a solid predicate of reason for seeking to find out what was in the bag. Justification for the inquiry commenced with defendant's having, by conduct, acquiesced in the precondition to entry to both building and courtroom: implied consent to a search; there is also ample and perhaps even transcendent justification to be found in the exigent nature of the situation. Both justified the inquiry and the slight reasonable detainer and intrusion.

Although by its express terms the Fourth Amendment prohibits only "unreasonable" searches and seizures, the Supreme Court has made it clear that "a search conducted without a warrant issued upon probable cause is *'per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *(Schneckloth v Bustamonte*, 412 US 218, 219, quoting *Katz v United States*, 389 US 347, 357; see, also, *Stoner v California*, 376 US 483, 486.) Two such exceptions to the warrant requirement which have developed over the years are searches conducted pursuant to consent *(Davis v United States*, 328 US 582, 593-594; *Zap v United States*, 328 US 624, 630) and searches undertaken in what have come to be called 'exigent circumstances' (see *Mincey v Arizona*, 437 US 385, 392-394; *Michigan v Tyler*, 436 US 499; *People v Mitchell*, 39 NY2d 173). Elements of both exceptions to the warrant requirement are present in this case.

"It is well established that the police[2] need not procure a

---

2. Of course, it must be understood that the same rules of law apply to court personnel, as peace officers, as they do to police. Citations referring to police must be read as though they specifically refer to court officers.

warrant in order to conduct a lawful search when they have obtained the voluntary consent of a party possessing the requisite authority or control over the premises or property to be inspected. *(Schneckloth v Bustamonte,* 412 US 218, *supra; Davis v United States,* 328 US 582, *supra; People v Lane,* 10 NY2d 347.) Furthermore, it is equally clear that these permissive searches are not limited to those instances where consent was given by the defendant." *(People v Adams,* 53 NY2d 1, 8.) The implied consent in the circumstances here depicted is as solid as any spoken or written consent. The inquiry and the request to search were reasonable and proper.

"Detached from the tension and drama of the moment, it is sometimes easy for an appellate court to lose sight of the fact that it is the reasonableness of police action which is the linchpin to analysis of any case arising under the Fourth Amendment. When judged in accordance with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act' *(Brinegar v United States,* 338 US 160, 175), the police conduct * * * [requesting examination of defendant's bag] was a reasonable response to the situation in which they found themselves and, therefore, was not proscribed by the exclusionary rule." *(People v Adams, supra,* p 11.)

What followed was, as described above, transfer of the actors to the clerk's office, the defendant's movement of hands from the counter toward the waist, the patdown, the finding of the gun and, *for the first time,* an arrest—for possession of the weapon. And even then defendant remained in character, with a trivial fillip concerning the FALN. Up to that point, everything which happened in a quick few minutes, brought on by the "profile" presented by defendant and his activities, was part of the inquiry concerning the bag.

It must be stressed that no one single detail in the evening's happenings may be said to have justified the inquiry; all were important. Nor was the single movement of the hands from counter to waist sufficient by itself to bring on the patdown. But that one movement on top of everything else which transpired during these tense few moments was enough to call for the patdown as a matter of self-protection.

There is no rule in law which has any value in the abstract; for it to have life and meaning, it must be applied to a set of facts, in which the participants are people, who act and react in a situation in a human way. The detainer by the officers for their inquiry was reasonable and entirely condign to the circumstances. "It should be emphasized that, in the context of a motor vehicle inspection 'stop', the degree of suspicion required to justify the stop is minimal. Nothing like probable cause as that term is used in the criminal law is required." *(People v Ingle*, 36 NY2d 413, 415.) How much more does this apply to the possibly explosive situation in a warning sign-bedecked courthouse in the circumstances described.

"Phrases of art like probable cause, reasonable suspicion, minimum level of intrusion, and stop and frisk are so much a part of the legal lexicon that by now one would have expected the development of a body of decisional law encapsulating into appropriate niches a constitutionally sanctioned course of conduct for the myriad * * * situations in which police officers find themselves. Unfortunately, however, for even the dispassionate court sitting in review long after the event, the determination as to what constitutes a proper police response does not always readily lend itself to resolution. And * * * time is a luxury hardly ever available. As here, he is often called upon to make split-second decisions". *(People v Valdez*, 78 AD2d 449, 452.)

"As noted in [*People v Cantor* (36 NY2d 106)] whether or not a particular search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment involved with respect to an individual's right to privacy and personal security (at p 111). Thus, we must consider first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible." *(People v De Bour*, 40 NY2d 210, 215.)

"The complex nature of urban society, with its propensity to serve as a breeding ground for crime, has focused attention upon societal needs in relation to individual liberties. The quest to reasonably protect the one without un-

duly infringing upon the other has impelled the courts to 'seek to balance society's interest in the detection and prevention of crime and in the protection of the lives and safety of law enforcement officers with the interest of individuals in living their lives free from governmental interference. Therefore, whether there has been an unreasonable breach of legitimate expectations of privacy involves consideration of (1) the nature and scope or severity of the interference with individual liberty, (2) the public interest served, and (3) the objective facts upon which the enforcement officer relied, in light of his knowledge and experience' *(People v Howard,* 50 NY2d 583, 589; see, also, *People v De Bour,* 40 NY2d 210). Here, the intrusion was, in the circumstances, minimal." *(People v Dean,* 79 AD2d 555, 556.)

"Reasonableness is the touchstone by which police conduct is measured under the Fourth Amendment. *(Cady v Dombrowski,* 413 US 433, 439; *People v Prochilo,* 41 NY2d 759, 761.) 'Whether * * * a particular search or seizure is to be considered reasonable requires weighing the government's interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security.' *(People v Cantor,* 36 NY2d 106, 111; *Terry v Ohio,* 391 US 1.) In weighing these interests, 'we must consider first whether * * * the police action was justified in its inception and secondly whether * * * that action was reasonably related in scope to the circumstances which rendered its initiation permissible.' *(People v De Bour,* 40 NY2d 210, 215.) Reasonableness is an amorphous concept. Hence, the propriety of police conduct in a citizen * * * encounter 'must necessarily turn on the facts in each individual case.' *(People v Green,* 35 NY2d 193, 195.)" *(People v Williams,* 79 AD2d 147, 148-149.)

"In assessing the reasonableness of police conduct * * * the Court of Appeals has stated that: '[T]he proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether * * * that predicate justified the extent of the official intrusion on the individual. Thus, the predicate established defines the scope of permissible police conduct.' *(People v Stewart,* 41 NY2d, at p 66.)" *(People v Bruce,* 78 AD2d 169, 172.)

"[T]he determination whether police conduct is reasonable ultimately involves a balancing of the citizen's right of privacy and society's interest in the apprehension of a suspected lawbreaker. *(People v Cantor*, 36 NY2d, at p 111; *People v Jackson*, 72 AD2d 149, 153.) The predicate for the police action defines the extent of the permissible intrusion. *(People v Steward*, 41 NY2d, at p 66.) * * * [P]rompt police action is compelled. Given this predicate, we should accord the police officers' assessment of the danger confronting them considerable weight in the determination of whether the intrusion was constitutionally justified." *(People v Bruce, supra*, p 175.)

Measured by the foregoing—not as abstractions but as applicable to this record—the court officers acted reasonably, both as to their initial involvement with defendant in the corridor and later in the clerk's office, with an absolute minimum of invasion of privacy and with a predicate of probable cause.

The order of suppression, Supreme Court, Bronx County (SULLIVAN, J.), entered July 1, 1980, should be reversed, on the law and the facts, and the matter remanded to Supreme Court, Bronx County, for further proceedings.

SULLIVAN, J. (dissenting). On Sunday, March 12, 1978, at about 7:00 P.M., defendant and four other individuals entered the arraignment part of the Bronx Criminal Court. Defendant, carrying a large attaché case resembling a suitcase, sat down in the rear of the courtroom and placed the case on his lap. He was immediately recognized by the two court officers on duty, Adler and Villanueva, as well as by the Assistant District Attorney, all of whom remembered him from earlier incidents in or around the courthouse. At one time defendant had led a demonstration outside the courthouse. Each of them knew of defendant's reputed association with FALN, a terrorist group. They were aware, also, that a cache of arms had been seized in his apartment a year earlier.

Both court officers and the Assistant District Attorney immediately sensed trouble. They thought it strange that defendant, given his familiarity with courthouse operations, would arrive after 7:00 P.M., knowing that Sunday court sessions usually conclude by 8:00 P.M. In addition, defen-

dant, who usually occupied a front row seat, had now seated himself in the rear of the courtroom. The large attaché case, not recognized as a piece of defendant's customary paraphernalia, as well as the manner in which he cradled it in his lap, only heightened an already aroused suspicion, and led Adler, Villanueva and the Assistant District Attorney to believe that defendant had a bomb in the attaché case. Even though one case on the court's calendar remained to be called, the two court officers and the Assistant District Attorney agreed that a recess should be sought so that the court officers could inspect the attaché case.

We digress briefly to note that signs, 18 by 24 inches in size, bearing the legend "PERSONS ENTERING THE BUILDING ARE SUBJECT TO SEARCH", were conspicuously posted at the entrance to the courthouse. Normally, a court officer assigned to the front desk near the entrance was instructed to inspect packages and any suspicious bulges on an individual's person before allowing the individual to proceed any further. On weekends, however, the desk is not manned and the court officers assigned to the arraignment part are primarily responsible for the conduct of any courthouse search. Posted on the outside of the doors to all the courtrooms were signs reading: "ALL PERSONS ENTERING THE COURTROOM ARE SUBJECT TO SEARCH".

A recess was announced and the spectators, including defendant, left the courtroom and congregated in the hallway. Court Officer Adler, accompanied by Villanueva and four other court officers, all in uniform, approached defendant, who was standing in a group and said to him "Please step into the clerk's office. I want to search your bag." Indignant, defendant drew back and replied, "No, you're not." Adler persisted. Defendant was adamant, "No, you can't search my bag if I am not under arrest. Am I under arrest?" Adler responded, "No, but I'm going to search your bag." When defendant once again insisted that in the absence of an arrest his bag could not be searched, Adler, anxious to avoid a riot, and without any actual intention of effectuating an arrest, said, "All right, then you are under arrest."

At this point Adler reached out to seize the attaché case. Shouting "take it, take it, take it", defendant attempted

to pass the case to one Gonzalez, who was standing nearby. Just as Gonzalez took the bag, Villanueva grabbed the handle and pulled it away. After Villanueva, assisted by another court officer, had secured control of the attaché case, defendant and his cohort were taken to the clerk's office, about 10 feet away.

Once inside the clerk's office defendant and the others with him were told to put their hands on the counter, a request with which they complied. Defendant, however, began to take his hands off the counter and to move them toward his midsection. Noticing this Adler commanded, "Put your hands back up." Concerned that he might have a weapon, Adler then patted defendant down. At the waist he felt what appeared to be the butt of a gun. Adler then removed a gun, which turned out to be a loaded, six-shot, .38 calibre revolver, from a holster in defendant's waistband. When asked why he needed a gun, defendant responded, "What's the matter? FALN can't come into court anymore."

After being assured by defendant that it did not contain any explosives, Adler opened the attaché case. Inside were telephone numbers, mimeographed announcements, address books, and a picture of Mao Tse Tung. Defendant was arrested for possession of a weapon and related crimes arising out of the incident. In a well-reasoned and comprehensive decision Trial Term granted defendant's motion to suppress the gun (104 Misc 2d 1095), a determination with which we agree.

At the outset we reject the People's argument, accepted by the majority, that defendant impliedly consented to a limited search of his attaché case by entering the courtroom with notice that he was subject to search. Consent will not be implied from the posting of signs. (See *Chenkin v Bellevue Hosp. Center*, 479 F Supp 207, 213; see, also, *Gaioni v Folmar*, 460 F Supp 10.) "If this argument were accepted, the government and quasi-public institutions would gain broad power to refashion the contours of the Fourth Amendment merely by proclamation." *(Chenkin v Bellevue Hosp. Center, supra*, at p 213.)

In recognition of the citizen's lessened expectation of privacy upon entering such premises and the State's legiti-

mate interest in maintaining security therein, courthouses, like airports[1], schools[2], military installations[3] and prisons[4], have been deemed special areas in which warrantless security searches under somewhat diminished Fourth Amendment requirements are permitted. (See *Downing v Kunzig*, 454 F2d 1230; *McMorris v Alioto*, 567 F2d 897; *United States v Miller*, 468 F2d 1041; *United States v Bell*, 457 F2d 1231; *Barrett v Kunzig*, 331 F Supp 266; *Collier v Miller*, 414 F Supp 1357, 1362; see, also, Jesmore, The Courthouse Search, 21 UCLA L Rev 797.) Such searches are designed "to assure that [government's] property and personnel are protected against damage, injury or destruction" *(Downing v Kunzig*, 454 F2d, at p 1233).

We are unaware, however, of any decision which has treated the courthouse as a special enclave where random nonconsensual searches are permitted on the basis of mere hunch or suspicion, instead of requiring consent or the traditional showing of justification—probable cause or reasonable suspicion that an individual is armed and dangerous.

*Downing, McMorris* and *Barrett (supra)* all involved a challenge to the courthouse security procedures employed. The methods of search were essentially identical. Persons entering the courthouse were required to pass through screening procedures and, upon request, to make available for inspection the contents of their briefcases or parcels. In each case the procedures were sustained on the basis of implied consent because the screening process recognized the individual's right to avoid the search by electing either not to seek access *(Downing v Kunzig*, 454 F2d, at p 1231; *McMorris v Alioto*, 567 F2d, at pp 899, 901), or to leave the briefcase for safekeeping or to permit a guard to accompany him to his destination *(Barrett v Kunzig*, 331 F Supp, at pp 270, 274). In *McMorris (supra*, p 901) the court noted that "[p]ersons entering the [courthouse] are not physic-

---

1. *United States v Albarado*, 495 F2d 799; *United States v Skipwith*, 482 F2d 1272; *United States v Davis*, 482 F2d 893.

2. *N. M. v Anker*, 607 F2d 588.

3. *United States v Ellis*, 547 F2d 863.

4. *United States v Sihler*, 562 F2d 349.

ally coerced to submit to the magnetometer search for the briefcase and parcel inspection. They may leave the premises at any time, even after activating the magnetometer." Thus, defendant's situation is readily distinguishable. He was never afforded the choice of leaving the courthouse or any other alternative that would have avoided the search. While normally an officer at the front desk would have offered him the option of opening his attaché case or being refused admittance, we fail to see why he should be denied these alternatives and his Fourth Amendment rights diluted because he entered the courthouse on a weekend. Furthermore, in each of the three cited cases, each person who sought entry to the courthouse was subject to the same procedures, unlike here, where defendant was singled out from among the 35 to 40 courtroom spectators, some of whom also were carrying bags.

The People also seek to justify the seizure of the gun as a limited, self-protective search by the court officer who reasonably suspected that defendant was armed and dangerous. In *Terry v Ohio* (392 US 1) the Supreme Court, recognizing (p 24) "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause", held (p 30) : "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

In courthouses, as elsewhere, a law enforcement officer may, of course, conduct a limited-scope, warrantless search based on his belief that the individual with whom he is dealing is armed. *(United States v Miller, 468 F2d, at p 1045.)* That right is embodied in CPL 140.50 which, by amend-

ment, extended the "stop and frisk" power to, among others, court officers of all criminal courts of this State in connection with their courtroom duties. (L 1972, ch 911, § 1, eff Sept. 1, 1972.) Such court officer "may stop a person in or about the courtroom to which he is assigned when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law" (CPL 140.50, subd 2). When he "reasonably suspects that he is in danger of physical injury, he may search such person for a deadly weapon or any instrument * * * readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons." (CPL 140.50, subd 3.)

The standard for determining the reasonableness of such a search was established in *Terry v Ohio* (392 US 1, 20, *supra*): "[W]hether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Reasonableness is the touchstone by which official conduct is measured under the Fourth Amendment. *(Cady v Dombrowski*, 413 US 433, 439.) To justify a "self-protective search for weapons", an officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *(Sibron v New York*, 392 US 40, 64.) The reasonableness of an officer's conduct "must necessarily turn on the facts in each individual case." *(People v Green*, 35 NY2d 193, 195.)

The Court of Appeals has outlined the conduct necessary to justify a frisk: "Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. * * * To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice * * * Nor will good faith on the part of the police be enough to validate an illegal interference with an individual". *(People v Cantor*, 36 NY2d 106, 112-113.)

In determining the reasonableness of police conduct in citizen encounters it has been noted: "[T]he proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether * * * that predicate justified the extent of the official intrusion on the individual. Thus, the predicate established defines the scope of permissible police conduct." *(People v Stewart,* 41 NY2d 65, 66.)

Viewing the facts here within the framework of these guidelines we are unable to conclude that the officers' suspicion that defendant was carrying explosives in his attaché case had a reasonable basis. That defendant had previously been arrested for possession of weapons and had on earlier occasions led disorderly demonstrations at the courthouse and, on this particular occasion, a Sunday evening, was seen carrying an attaché case which he cradled on his lap, rather than placing it on the floor and seated himself, after arriving late, in the rear of the courtroom, instead of his customary, front row station, does not give rise to a reasonable suspicion that the attaché case contained a bomb. Nor may one's reputation or political affiliation be the primary basis for initiating a search. (See *United States v Harris,* 403 US 573, 582; *Rice v Wolff,* 388 F Supp 185, affd 513 F2d 1280, revd on other grounds *sub nom. Stone v Powell,* 428 US 465; also *Nathanson v United States,* 290 US 41, 46; *Spinelli v United States,* 393 US 410, 414.)

Furthermore, defendant's refusal to submit to a search of his attaché case or to co-operate does not constitute an unusual activity which would trigger a reasonable suspicion that he was carrying a bomb. He had a constitutional right to refuse to be searched *(People v Howard,* 50 NY2d 583, 590), and his refusal to submit "cannot constitute a criminal act" *(People v Schanbarger,* 24 NY2d 288, 292). The arrest which followed was a pretext, intended solely to facilitate the desired search. Such arrests have been uniformly condemned. (See *Bowling v United States,* 350 F2d 1002; *Taglavore v United States,* 291 F2d 262; *Williams v United States,* 418 F2d 159, affd 401 US 646; see, also, *Sibron v New York,* 392 US 40, *supra; People v De*

*Bour,* 40 NY2d, at p 224; *People v Cantor,* 36 NY2d, at p 114; *People v Stewart,* 41 NY2d, at p 69.)

The majority finds that, although defendant was told that he was "under arrest", no arrest, in fact, took place. We disagree. "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment". *(People v Cantor,* 36 NY2d, at p 111; see *Terry v Ohio,* 392 US, at p 16.) That the court officers did not believe an arrest had occurred before seizure of the gun is of no moment. (See *Bailey v United States,* 389 F2d 305, 308.)

The illegality of the seizure, in turn, tainted the discovery of the weapon. Evidence discovered as a direct result of an illegal seizure must be suppressed as "the fruit of the poisonous tree." *(Wong Sun v United States,* 371 US 471; see *Miller v United States,* 357 US 301; *Silverthorne Lbr. Co. v United States,* 251 US 385.) Nor was the taint of the illegal detention dissipated by defendant's subsequent removal of his hands from the counter and movement of them toward his midsection. Since the "arrest" was designed to uncover a bomb or other incendiary device the court officers' conduct "had a quality of purposefulness" *(Brown v Illinois,* 422 US 590, 605). Such purposeful exploitation taints the discovery of the weapon. (Cf. *People v Boodle,* 47 NY2d 398, 404.)

Accordingly, the order suppressing the gun should be affirmed.

KUPFERMAN, J. P., and LUPIANO, J., concur with MARKEWICH, J.; SANDLER and SULLIVAN, JJ., dissent in an opinion by SULLIVAN, J.

Order, Supreme Court, Bronx County, entered on July 1, 1980, reversed, on the law and the facts, and the matter remanded to Supreme Court, Bronx County, for further proceedings.