■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BEN CRUZ, Appellant. — Judgment of the Supreme Court, Bronx County (Schackman, J., at pretrial hearing; Parness, J., at plea and sentence), rendered on January 7, 1982, convicting defendant-appellant, upon a plea of guilty, of criminal possession of a controlled substance in the third degree and sentencing him to an indetermiate term of one to three years, affirmed. The presence of the police officers at 2565 Marion Avenue, Bronx County, on the morning of August 19, 1979, was due to a report that a shooting had occurred at that location. When they arrived, the appellant, who had been shot, was lying sprawled across the entrance hallway of his apartment. In addition, based upon what the police were told by a neighbor, as well as their own observations, there was a significant possibility that the perpetrator was still in the apartment. The fact that the police officers went into the apartment in order to apprehend the individual who had shot the appellant is demonstrated by their entry with guns drawn. Clearly, the police were confronted with an exigent circumstance such as to justify the ensuing warrantless search and seizure (*People v Hodge,* 44 NY2d 553). The search was not motivated primarily by a search for contraband but was pursuant to a reasonable belief that an emergency existed which required immediate action for the protection of life or property (*People v Mitchell,* 39 NY2d 173). Once the officers were legally in the appellant's apartment, they were permitted to seize those items in plain view. Although the search here did extend to areas not in plain view, the court which conducted the pretrial hearing properly ruled that the paper bag situated on top of the dresser and the gun found in the dresser drawer should be suppressed. Concur — Sandler, J. P., Bloom and Milonas, JJ.

Carro and Fein, JJ., dissent in a memorandum by Carro, J., as follows: I

dissent. Ben Cruz came home at 8:00 A.M., unlocked his apartment door and had a gun jabbed in his back by an unknown assailant. In a struggle, Mr. Cruz was shot twice, in the back and in the leg. The intruder, after rifling his victim's pockets, fled, and Cruz, unable to dial the wall phone, crawled to the hallway and cried for help. A neighbor heard him and Cruz asked her to call the police. He then passed out on the threshold to his apartment. The police were called by the neighbor, but the time of the call and the time of their arrival is not clear. Both officers place it at about 8:30 A.M. Believing, perhaps justifiably, that the assailant might still be in the apartment, the officers searched with guns drawn. In the bedroom a noise from under the bed allegedly startled them and rather than bend down to look, one officer lifted the corner of the bed. A small Chihuahua ran out. Since the bedroom was the last room searched, the matter should have ended there. But these were conscientious police officers, and they proceeded to search the bedroom thoroughly, opening dresser and drawers and the like in their "hot pursuit" of the assailant. Meanwhile, Mr. Cruz languished, unconscious and bleeding, in the hall. The officer's diligence paid off, however. Although they didn't find the gunman in the dresser they did uncover a gun and several bags of assorted drugs. Thus, at either 9:55 A.M. or 11:05 A.M. (depending on whether one reads the criminal court complaint or the arrest report), Mr. Cruz was arrested, at least an hour and a half after the officers responded to this emergency. Both the arrest report and the arresting officer's complaint report state that the gun and contraband were "on the bed, in plain view". At the suppression hearing the two officers who conducted the search admitted that the gun and all of the contraband save one bag were found on top of or in the dresser. One paper bag, though, was "on the bed * * * lying on its side. Next to the brown bag we seen tinfoil packets." Guns drawn, the officers "approached the bag, looked in the bag * * * on the bag there was tinfoil packets." They then lifted the bed, as already related, and the dog made his escape. The next witness to testify was an Assistant District Attorney who had spoken to one officer. He remembered him reporting that they had noticed movement under the bed as soon as they entered the bedroom. So, one officer "pulled back the mattress, pulled it up at which point the Chihuahua, the dog, jumped out and indicated it scared the hell out of him. At which point, he threw the mattress back down and at which time the bed, he said it was rumpled, I assume it wasn't made and everything came down, you know, the bedsheets and the blankets along with this paper bag. He stated the paper bag, the glassine envelopes fell out of the paper bag, at which point, he picked it up. That's my recollection." When asked by the court whether the officer has said that "he saw either glassine envelopes or tinfoil packets out of that bag prior to the time he lifted up the mattress", the Assistant District Attorney stated, "That's not my recollection." To this the hearing Judge commented: "Very interesting. Just destroyed the credibility of the two officers that testified". Noting that he was "faced with three stories" (what the officers testified to, what the Assistant District Attorney reported, and "what might really have happened") the court observed that "If I cannot believe them, then I don't have to believe any story." Since the officers had testified from memory, the court made a partial decision, suppressing the gun and bags found in the dresser. As to the brown bag allegedly found on the bed, however, the Judge gave the People a month to locate any "official reports" which might corroborate the prosecution assertion that the bags were found "in plain view". Incredibly, at the adjourned date the People did *not* produce any reports, but rather, put a second Assistant District Attorney on the stand. Questioned by the Assistant District Attorney *who had previously testified,* this second prosecutor was completely vague about time, dates, who did what,

etc., except to testify that both officers "indicated that it was in plain view on the bed. They mentioned something about a dresser also, but the bulk of the narcotics as far as that I recall, on the bed * * * 200 and some odd tin foils of cocaine." This Assistant District Attorney also had no notes. Upon this and the prior testimony, without any reference to the missing notes and prior inconsistencies which had "destroyed the credibility of the two officers" the court found the drugs to have been "in plain view." Accordingly, the motion to suppress the cocaine was denied. Clearly, if the police have reasonable grounds to believe there is an emergency at hand, with the immediate need for their assistance to protect life or property, they may conduct a limited search that is not primarily motivated by an intent to seize evidence. (*People v Mitchell,* 39 NY2d 173.) Assuming the officers here had a good faith belief that the assailant might still be present, the "emergency" doctrine validated the search of the apartment for the limited purpose of apprehending the mugger. And, lawfully in the bedroom, they could properly seize the contraband which was inadvertently viewed. (*Coolidge v New Hampshire,* 403 US 443.) Put another way, "[t]he 'plain view' doctrine requires that there be *prior justification* for the intrusion, during which a piece of evidence is inadvertently seen". (*People v La Borde,* 66 AD2d 803, 804.) But "[c]onstitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum". (*People v Mitchell,* 39 NY2d, *supra,* at p 180.) "There is no rule which has any value in the abstract; for it to have life and meaning, it must be applied to a set of facts, in which the participants are people, who act and react in * * * a human way." (*People v Alba,* 81 AD2d 345, 352 [per Markewich, J.].) In the case at bar the defendant was an obviously helpless victim, and the purpose for which the police were summoned became perverted into what Lord Carrington aptly termed a "roving" search. It is unclear what really took place; was there a spilled bag of contraband on the bedsheet, or did the zealousness of the officers extract from dresser to bedsheet evidence of Ben Cruz' guilty possession? Certainly, as the trial court initially found, the inconsistencies overwhelmed reason, and no conclusion was certain. What is certain is that the testimony of the officers admitted a "full-blown, rummaging search" (*People v Gonzalez,* 39 NY2d 122, 127) and the countless inconsistencies hardly rehabilitate testimony that "has all the indicia of having been patently tailored to overcome the defendant's objection". (*People v Parmiter,* 55 AD2d 938.) Although "[i]nitially, the defendant carries the burden of *proof* when he challenges the legality of a search and seizure (see, e.g., *Nardone* v. *United States,* 308 U. S. 338, 342) * * * the People have the burden of *going forward* to show the legality of the police conduct in the first instance (*People v Malinsky,* 15 N Y 2d 86, 91, n. 2)." (*People v Whitehurst,* 25 NY2d 389, 391 [per Burke, J.].) To my mind the People have woefully failed to meet that burden here, and the actions of the court in, first postponing the hearing, and second, in allowing the first Assistant District Attorney (who had testified a month before) to put on a second Assistant District Attorney as a witness, destroyed the whole and made a mockery of the purpose of the hearing. Totally aside from the ethical problem of a former witness acting as prosecutor, the court's initial finding of "destroyed credibility" as to the officers was hardly rehabilitated by an Assistant District Attorney who, testifying about a conversation occurring 15 months earlier, could remember no detail save that the bag of dope was spilling out in plain view. I believe that we should "refuse to credit testimony which has all appearances of having been patently tailored to nullify constitutional objections." (*People v Garafolo,* 44 AD2d 86, 88.) Simply put, while I do believe that "[t]he officer's claim * * * is not credible" (*People v Maldonado,* 75 AD2d 558, 559), it is even clearer to me that in the instant case the People have simply

failed to carry their heavy burden of showing the search and seizure to have been the product of lawful, necessary and inadvertent procedure. (*McDonald v United States,* 335 US 451; *Jackson v United States,* 122 DC App 324; *Matter of Kwok T.,* 43 NY2d 213, 221.)