■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PAMELA RENEE RUSS, Appellant. — Judgment, Supreme Court, New York County (Preminger, J., at plea and sentence; Greenfield, J., at suppression hearing), rendered December 15, 1980, affirmed as to both the order of denial of the suppression motion and the judgment flowing from the plea of guilty. Sandler, J. P., Sullivan and Markewich, JJ., concur in separate memoranda by Markewich, J., and Sandler, J. P.; and Milonas, J., dissents in a memorandum; all as follows:

Markewich, J. (concurring). While we accept the statement of the facts as set forth by our dissenting brother, we do not agree with his conclusion that the motion to suppress should have been granted. The facts, contrary to the dissent's position, do not add up to a case of a police officer acting solely in

reliance upon an anonymous radio description of a man, not the defendant, who was never seen by the officer, and who is not before the court. Not at all. In evaluating the circumstances by holding them up for inspection in order to make findings to lead us to the applicable law, one cannot take possibly pertinent rules of law and fit the facts into them. Rules of law must derive from the facts, and must be more than mere abstractions. "There is no rule in law which has any value in the abstract; for it to have life and meaning, it must be applied to a set of facts, in which the participants are people, who act and react in a situation in a human way." (*People v Alba,* 81 AD2d 345, 352.) "[A] radioed tip may have almost no legal significance when it stands alone, but * * * when considered in conjunction with other supportive facts, it may thus collectively, although not independently, support a reasonable suspicion justifying intrusive police action." (*People v Benjamin,* 51 NY2d 267, 270.) This applies precisely to the situation before us. When police knowledge and experience are considered along with all the discernible objective facts, there emerges a complete pattern justifying police intervention. " 'Phrases of art like probable cause, reasonable suspicion, minimum level of intrusion, and stop and frisk are so much a part of the legal lexicon that by now one would have expected the development of a body of decisional law encapsulating into appropriate niches a constitutionally sanctioned course of conduct for the myriad * * * situations in which police officers find themselves. Unfortunately, however, for even the dispassionate court sitting in review long after the event, the determination as to what constitutes a proper police response does not always readily lend itself to resolution. And * * * time is a luxury hardly ever available. As here, he is often called upon to make split-second decisions'. (*People v Valdez,* 78 AD2d 449, 452.) 'As noted in [*People v Cantor* (36 NY2d 106)] whether or not a particular search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment involved with respect to an individual's right to privacy and personal security (at p 111). Thus, we must consider first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible.' (*People v De Bour,* 40 NY2d 210, 215.) 'The complex nature of urban society, with its propensity to serve as a breeding ground for crime, has focused attention upon societal needs in relation to individual liberties. The quest to reasonably protect the one without unduly infringing upon the other has impelled the courts to "seek to balance society's interest in the detection and prevention of crime and in the protection of the lives and safety of law enforcement officers with the interest of individuals in living their lives free from governmental interference. Therefore, whether there has been an unreasonable breach of legitimate expectations of privacy involves consideration of (1) the nature and scope or severity of the interference with individual liberty, (2) the public interest served, and (3) the objective facts upon which the enforcement officer relied, in light of his knowledge and experience" (*People v Howard,* 50 NY2d 583, 589; see, also, *People v De Bour,* 40 NY2d 210). Here, the intrusion was, in the circumstances, minimal.' (*People v Dean,* 79 AD2d 555, 556.) 'Reasonableness is the touchstone by which police conduct is measured under the Fourth Amendment. (*Cady v Dombrowski,* 413 US 433, 439; *People v Prochilo,* 41 NY2d 759, 761.) "Whether * * * a particular search or seizure is to be considered reasonable requires weighing the government's interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security." (*People v Cantor,* 36 NY2d 106, 111; *Terry v Ohio,* 391 US 1.) In weighing these interests, "we must consider first whether * * * the police action was justified in its inception and

secondly whether * * * that action was reasonably related in scope to the circumstances which rendered its initiation permissible." (*People v De Bour,* 40 NY2d 210, 215.) Reasonableness is an amorphous concept. Hence, the propriety of police conduct in a citizen * * * encounter "must necessarily turn on the facts in each individual case." (*People v Green,* 35 NY2d 193, 195.)' (*People v Williams,* 79 AD2d 147, 148-149.) 'In assessing the reasonableness of police conduct * * * the Court of Appeals has stated that: "[T]he proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether * * * that predicate justified the extent of the official intrusion on the individual. Thus, the predicate established defines the scope of permissible police conduct." (*People v Stewart,* 41 NY2d, at p 66.)' (*People v Bruce,* 78 AD2d 169, 172.) '[T]he determination whether police conduct is reasonable ultimately involves a balancing of the citizen's right of privacy and society's interest in the apprehension of a suspected lawbreaker. (*People v Cantor,* 36 NY2d, at p 111; *People v Jackson,* 72 AD2d 149, 153.) The predicate for the police action defines the extent of the permissible intrusion. (*People v Stewart,* 41 NY2d, at p 66.) * * * [P]rompt police action is compelled. Given this predicate, we should accord the police officers' assessment of the danger confronting them considerable weight in the determination of whether the intrusion was constitutionally justified.' (*People v Bruce, supra,* p 175.)" (*People v Alba, supra,* at pp 352-354.) And so we turn to examination of the evidence in the light of the foregoing lessons. To begin with, the description of the man referred to in the radio run mattered not at all, but other factors in the radio run did: that a gun had been handed over to that man by a woman in a blue, white-top automobile. And, as though a cue line had been spoken, there appeared at once to the officer's sight the automobile just described with a woman sitting in it. To be borne in mind is that the target of the police action was, first, the gun and, only secondarily, its possessor. Further, as is a matter of common knowledge not alone to police, criminals quite often do not personally carry the weapons they may wish to use, but entrust them, between or before or after engagements, to so-called "gun molls".* The purpose is obviously to reduce the risk of being themselves found in possession of contraband. Since the officer knew this, and also had heard that the earlier reported possessor of a weapon in the very described car had received it from a woman, the distinct possibility presented itself that the gun may have been returned to its place of bailment, and that hence immediate police action was required. Self-protection obviously demanded the ready availability of the officer's own weapon while continuing his investigation into the presence of the other firearm. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety. Considering the totality of the circumstances, including the radio call and the information acquired by observation at the scene, there was an ample measure of reasonable suspicion necessary to justify the limited intrusion which produced the loaded revolver." (*People v Benjamin,* 51 NY2d 267, 271, *supra.*) One final observation. It may well have been, as the dissent has it, that "Officer McCormick did not assert that he was fearful for the life or safety of himself or other individuals." The presence or absence of these words is not, however, determinative. It is easy to understand that, in his appropriate and almost Pavlovian response to the information he had acquired both before and after arrival, and the emergency confronting him, the officer's adrenalin was in full flow, and, weapon in hand, he felt equal to any eventuality. That would have been the reality of the situation. The suppression motion was properly denied.

Sandler, J. (concurring). A careful review of the principal relevant decisions in the Court of Appeals has persuaded me that none of them set forth a

---

* Webster, Third New International Dictionary, p 1012.

principle squarely controlling the issue presented on this appeal. The decisions relied upon in the dissenting opinion are all distinguishable, the principal distinction being that the Court of Appeals has never held that reasonable suspicion justifying a stop and frisk pursuant to CPL 140.50 could not be founded on an anonymous communication of a person with a gun if the communication gave such specific identifying details that a police officer could be assured that a particular person was the one described. (See *People v La Pene*, 40 NY2d 210; *People v Stewart*, 41 NY2d 65.) On the other hand, those authorities that appear to support the police action here are also distinguishable on separate grounds. (See *People v McLaurin*, 43 NY2d 902, revg on dissenting opn 56 AD2d 80, 84-85; *People v Klass*, 55 NY2d 821.) However, a study of the leading cases strongly suggests that the trend is clearly in the direction of sustaining the police action in this case. I am in agreement with this development, notwithstanding my awareness of the problems presented by police action based on anonymous communications and the reality that such action enlarges the possibility of distasteful interference with the person of individuals who in fact are innocent of any wrongdoing. As against this there must be weighed the reality that society cannot sensibly deny to police officers engaged in the discharge of their duties the right to take reasonable precautions for their personal security. The facts in this case nicely illustrate the underlying problem. The radio communication received by the police officers — the passing of a gun from a woman to a man in a described car — clearly imposed upon the officers the obligation to proceed to the specified location. From their observation of a parked car fitting the description given at the precise location reported in the communication, with a woman inside the car, the police could have reasonably concluded that she was the person described as having given a gun to another. Moreover, this observation verified in part the reliability of the unknown informant. The immediate question presented is whether the police officers could have reasonably suspected that the woman in the car had committed the crime of unlawful possession of a weapon. Two possibilities are presented. One is that the informant was engaged in a malicious joke addressed to the occupant of the car. The second is that the informant was someone who had actually observed the described event and had discharged a civic duty by reporting it without wishing to be further involved in the matter. When the situation is evaluated in the light of human experience, and from the standpoint of the police officers, it seems to me apparent, notwithstanding our historic distrust of anonymous informants, that the police officers could reasonably have concluded that there was at least a substantial possibility that the information received was accurate. In short, the officers could have reasonably suspected that the defendant had committed a crime. Therefore, they were entitled to question her pursuant to the authority conferred in CPL 140.50, and, at a minimum, were justified in directing defendant to step out of the vehicle. It would have been manifest folly for them to have conducted defendant's interrogation through an open window of the car while she remained in the vehicle. A closer question is whether the police officers could have reasonably suspected danger of physical injury justifying the pat down of defendant's person that occurred. As to that, it must be recognized that although the situation observed by them appeared peaceful, it presented a very different aspect when considered in the light of the information that the police had received. They had been told that a woman, almost certainly the woman in the car, had passed a gun to a man. The man was not in the car when they arrived. The passing of a gun by one person to another in a vehicle, followed by the departure from the vehicle of the recipient of the gun while the original possessor remains, suggests strongly the possibility that the

gun was transferred with a view to its being employed in a criminal activity that either was occurring or was about to occur; that the person remaining in the car had knowledge of that criminal activity and was a participant in it; and that she was awaiting the return of the second person. Accordingly, the police were faced with what could reasonably have been assessed by them as an urgent law enforcement problem, accompanied by elements of potential danger, and requiring prompt action. As Justice Markewich's concurring memorandum points out, it was possible that the transferred weapon had been returned to the person who originally had it. It was also possible that she possessed a second weapon. Neither of these possibilities seems to me substantial, but I do not think that we can reasonably ask police officers to risk their lives under ·the totality of circumstances presented by proceeding on the assumption that the defendant was not armed. In *People v Williams* (41 NY2d 65, 70), the companion case to *People v Stewart* (*supra*), the Court of Appeals described an exterior pat down of the kind that here occurred as a "minor intrusion". I do not believe that this pat down was an excessive police response under all the circumstances, and accordingly join the court in affirming.

Milonas, J. (dissenting). I would reverse the conviction and dismiss the indictment. This is an appeal from a judgment of the Supreme Court, New York County (Greenfield, J., at pretrial hearing; Preminger, J., at plea/sentence), entered on December 15, 1980, convicting the defendant, upon her plea of guilty, of attempted criminal possession of a weapon in the third degree, and sentencing her to a conditional discharge for a period of three years. Defendant's conviction arose out of her arrest on May 23, 1979 for possession of a loaded two-barrel Derringer. According to the pretrial hearing testimony of the arresting officer, Robert McCormick, at approximately 4:50 P.M., he and his partner were on motor patrol duty when they received a radio call concerning a black male with a gun sitting in a blue, white-top automobile parked in front of 123 West 112th Street. Purportedly with him in the vehicle was a female (no description provided) who was alleged to have handed him the gun. The officers drove to the reported location and sighted a blue and white car. There was only one person inside, the female defendant seated in the front passenger seat. Approaching the automobile with his gun drawn, Officer McCormick opened the front passenger door and ordered the defendant to get out. He patted her down and recovered a Derringer from the waistband area. She was then placed under arrest. At the conclusion of the hearing, the court found that the police officers had acted reasonably and denied the motion to suppress. It is clear that the radio message, deriving from an undetermined source, was the only basis for the police conduct. There was nothing unusual occurring at the scene, nor did the defendant do anything which could be remotely construed as furtive or suspicious. Moreover, Officer McCormick admitted that when he first noticed the vehicle, he made no effort to look around to ascertain if there were any males in the vicinity. He stated that he made no attempt to verify or substantiate the information contained in the radio run or to question the defendant prior to frisking her. There was also no claim of a bulge or outline of a weapon being visible anywhere on the person of the defendant. At the time of the incident at issue, it was broad daylight. The neighborhood was not one characterized as being a high-crime area, and Officer McCormick did not assert that he was fearful for the life or safety of himself.or other individuals. Under these circumstances, the police were not justified in frisking the defendant. In *People v La Pene* (40 NY2d 210), the Court of Appeals held that the People could not rely solely on an anonymous phone call to furnish sufficient cause to support the police frisk which took place in that case. As the court declared (p 224): "Tips of this nature are of the

weakest sort since no one can be held accountable if the information is in fact false". Similarly, in *People v Stewart* (41 NY2d 65, 69), the court, in reversing the conviction, concluded that "where an anonymous phone tip giving a general description and location of a 'man with a gun' is the sole predicate, it will generate only a belief that criminal activity is afoot * * * That type of information will not of itself constitute reasonable suspicion thereby warranting a stop and frisk of anyone who happens to fit that description * * * In that situation, the police have only the common-law power to inquire for purposes of maintaining the *status quo* until additional information can be acquired". Although the court in *People v Benjamin* (51 NY2d 267) sustained the patdown search therein, it pointed out that it was the personal observations of the police, as well as the information furnished in the radio run, which provided the reasonable suspicion necessary to support the limited intrusion in that situation. The court noted (p 270) that "an anonymous tip of 'men with guns', standing alone, does not justify intrusive police action, and certainly does not rise to the level of reasonable suspicion warranting a stop and frisk". Both the memorandum opinion of this court and the concurrence largely base their support of the hearing court's determination on speculation as to what the woman might have been doing rather than on any objective discernable facts. Thus, the memorandum for the list conjectures that it is common knowledge that criminals often entrust their weapons to "gun molls". Similarly, the concurring opinion offers other conceivable explanations, including the possibility of the defendant's possession of a second weapon, to justify the conduct of the police officers. Police action cannot be predicated solely upon suppositions and suspicions. We have yet to reach the point suggested by the majority where a good-faith evaluation of the situation by the police officers prevails over the observable criteria. Where, as here, the radio message did not give any description of the woman in the car nor did it even state that she was in possession of a gun (but instead claimed that she had handed the weapon to the man), something more substantial than the defendant's presence in a blue, white-topped automobile was required to support the patdown search which took place herein. Consequently, the motion to suppress the physical evidence should have been granted.