OPINION OF THE COURT
Ralph Fabrizio, J.
*1053 The issue presented in this case is whether a visitor to a courthouse implicitly consents to an X-ray and hand search of the inside of his knapsack as a condition of entry into the building. The defendant is charged with petit larceny (Penal Law § 155.25) and criminal possession of stolen property (Penal Law § 165.40). The defendant is accused of stealing a handbag belonging to an employee of the Bronx Defenders, a public defenders organization. The handbag was recovered from inside the defendant’s knapsack during a search conducted by a uniformed court officer as the defendant was entering the courthouse. He has moved to suppress the bag, as well as other items recovered from him by the court officer, arguing that the property was seized in violation of his constitutional rights. He has also moved to suppress certain statements he made to the court officer. After conducting a pretrial suppression hearing, the court denies the defendant’s motions in their entirety.
Findings of Fact
Uniformed Court Officer William McGonnigle has worked at the Bronx Criminal Court Building at 215 East 161st Street for about four years. During this period he has been assigned to various court parts, to security details, and to work with other court officers at the front entrance to the building screening visitors and their belongings in an area he referred to as “the mags.” Court officers assigned to this area search all visitors for items that can be used as weapons. The area contains eight separate stations equipped with magnetometers and X-ray machines. All nonemployees visiting the courthouse are required to enter through this area, empty the items contained in their pockets into plastic bins, and walk through a magnetometer. All visitors must also relinquish any bags or items they carry to the court officer at the station. The bags are first X-rayed. Then, the officers open any bags and conduct a brief visual inspection of their contents. There are no signs posted in the area advising visitors that they or their bags must be searched prior to entering the courthouse.
On February 5, 2003, Officer McGonnigle was assigned to magnetometer station number 4. At about 12:55 p.m., Court Officer Anthony Rodriguez told Officer McGonnigle that a woman employee of the Bronx Defenders had reported that her handbag was stolen from inside the AP-2 courtroom. Officer Rodriguez had spoken with the woman, and she told him that the item stolen was a small, brown “Fendi” handbag. At about 1:30 p.m., the same woman walked up to Officer McGonnigle and told him *1054 that she was the individual whose Fendi bag was stolen from inside the courtroom. She said that she believed that the person sitting on a bench next to the bag might have been the one who had taken it, although she never actually saw the person take it. She provided no description of that individual.
About 15 minutes later, the defendant approached Officer Mc-Gonnigle at magnetometer station number 4. The defendant was carrying a black knapsack. He emptied all the items in his pockets into a plastic bin, and he handed the bin and his knapsack to Officer McGonnigle to have them X-rayed. The defendant then walked through the magnetometer, and the magnetometer “rang,” indicating that he might be carrying some metallic item. The defendant’s body was then scanned with a hand-held “wand” used to detect metal objects by Court Officer Juan Paez, who was assigned to the same magnetometer station. Meanwhile, the X-ray showed nondescript “clusters” of items inside the defendant’s knapsack. Pursuant to normal protocol, Officer McGonnigle opened the knapsack to inspect the contents. A Fendi purse was right inside the knapsack. The bag was about 8 inches long, 3 1/2 inches wide, and was brown.
Officer McGonnigle asked the defendant whether the Fendi bag belonged to him. The defendant said, “I found it in the courtroom and was bringing it back.” He also said that he had been the “last person in the courtroom.” Officer McGonnigle knew that the AP-2 courtroom had been thoroughly searched by other court officers, all spectators had been told to leave, and the courtroom was locked prior to 1:00 p.m. Officer McGonnigle took the defendant to a small “operations” room located a few feet away from the magnetometer station. Once there, he searched through the defendant’s knapsack. A checkbook belonging to the Bronx Defenders employee was inside the knapsack, outside the Fendi bag. The officer then searched the defendant’s wallet. The employee’s driver’s license as well as her debit card were inside the defendant’s wallet, behind the defendant’s own identification card.
The officer and the defendant left the operations room at about 2:15 p.m. The defendant was taken from the first floor to holding cells on the third floor. At about 2:30 p.m., Officer McGonnigle read the defendant what he characterized to be “Miranda warnings” from a list posted right next to the cell. The defendant answered “yes” to each question posed, and indicated that he understood his rights. Officer McGonnigle did not ask the defendant any questions. While in the cell, the defendant *1055 kept repeating, in substance, “I didn’t steal anything. I didn’t steal the purse. This is a set-up.”
Conclusions of Law
There is a “compelling governmental interest” to protect the public “in courthouses and other buildings.” (People v Rincon, 177 AD2d 125, 127 [1st Dept 1992].) Therefore, mandatory, limited searches of visitors entering public buildings, such as courthouses, have become the rule. In light of the government’s interest, “the interdiction against searches without probable cause or reasonable suspicion is relaxed to the extent of allowing a minimally intrusive search uniformly applied to those seeking entry” into these types of buildings. (Id. at 127, citing People v Price, 54 NY2d 557, 563 [1981].) In fact, because “the risk to public safety [in government buildings] is substantial and real, blanket suspicionless searches calibrated to the risk may rank as ‘reasonable’ — for example, searches now routine at . . . entrances to courts and other official buildings.” (Chandler v Miller, 520 US 305, 323 [1997].) Thus, limited warrantless searches of individuals entering government buildings, as well as a limited search of an individual’s belongings, are permissible as long as they are “part of a general practice and not for the purpose of securing evidence for criminal investigations.” (Legal Aid Socy. of Orange County v Crosson, 784 F Supp 1127, 1130 [SD NY 1992].)
In this case, there is no question that the initial search of the inside of the defendant’s knapsack was constitutionally valid. Officer McGonnigle, whose testimony is credited in its entirety, stated that all members of the general public who enter the front door of the building must first pass through the security area to be searched before they are allowed access into the building. The purpose of these searches is to locate and retrieve any weapons or other items that would pose a danger to others in the criminal court building.[1] As such, there is a legitimate governmental interest in requiring the searches. Moreover, since all members of the general public are searched in the same *1056 manner, the defendant in this case was not subjected to an arbitrary or unique procedure when he and his belongings were searched. (See Rincon, 177 AD2d at 129-130.) Therefore, the search of the defendant’s knapsack was reasonable and proper at its inception.
The defendant also consented to the search. He emptied his pockets, gave his knapsack to the court officer, and walked through the metal detectors. There is no evidence that the defendant protested or refused to submit to the search procedures. Thus, the defendant voluntarily relinquished his knapsack to the court officer, and that conduct established his consent to have it searched. (See State v Kurth, 981 SW2d 410, 415 [Tex Ct App, 4th Dist 1998].)
He argues, nonetheless, that he was not on notice that he and his knapsack would be searched prior to entry because there are no signs posted at the entrance to the building advising visitors like himself of the search procedures, and therefore his consent was not voluntary. As Officer McGonnigle testified, there are eight separate stations with magnetometers and X-ray machines directly inside the front entrance to the building. This is the same type of equipment that stands at the entrances to all government buildings, airport terminals, train stations, public schools, arenas, stadiums, and countless other venues in this city and country. The mere presence of this equipment at the entrance to a building is more than adequate notice to individuals that they and their bags will be screened and searched if they want to enter these places. Anyone who does not want to go through the metal detectors and have their bags scanned by the X-ray equipment can simply turn around and walk away. In this type of situation, printed words on a sign would do nothing more than state the obvious.[2] Under all the circumstances, the defendant voluntarily submitted to an inspection of his bag and himself.
Moreover, the methods used to search the defendant’s knapsack were entirely reasonable. Without question, subjecting a person’s bag to X-ray analysis constitutes a search. (See People v Waring, 174 AD2d 16 [2d Dept 1992]; People v Ross, 157 AD2d 808 [2d Dept 1990].) Initial X-ray screening of the *1057 contents of visitors’ bags for weapons is a moderately intrusive and completely reasonable method of screening for weapons and providing the protection required for individuals in courthouses and other government buildings. The court officer’s decision to perform a visual scan of the items in the knapsack in this case was also reasonable. The protocol allowing for such a search makes perfect sense, as the court officer testified that the X-rays often only show ambiguous images. Weapons can easily be concealed in other items and therefore would be visible on an X-ray monitor. In this day and age, it is all too common that some of the deadliest of weapons have turned up in the smallest of packages. A follow-up visual inspection of the interiors of briefcases and bags is necessary following an X-ray search to confirm that there is nothing dangerous inside these types of containers. In this case, the X-ray only disclosed the presence of “clusters” of items, and therefore the court officer’s decision to open the backpack and visually inspect the items inside to see if there were any weapons was reasonable and appropriate. (See Bozer v Higgins, 157 Misc 2d 160 [Sup Ct, Erie County 1992], mod 204 AD2d 979 [4th Dept 1994]; cf. United States v Bulacan, 156 F3d 963 [9th Cir 1998] [impermissible to open visitor’s bag at courthouse entrance where justification for search went beyond screening for weapons].)
Once the bag was opened, Officer McGonnigle immediately observed a small Fendi purse, brown in color. A handbag matching that description had been reported stolen from inside a courtroom only about one hour earlier. The fact that the defendant, a man, was carrying a woman’s bag concealed inside his knapsack provided probable cause to arrest him. (See Penal Law § 165.55 [1]; People v Cintron, 95 NY2d 329, 332 [2000].) The officer did not place the defendant under arrest at that moment, nor did he conduct any further search at that time. Rather, he asked the defendant whether the Fendi bag belonged to him. This questioning was plainly permissible as part of a valid investigation involving the theft of a bag inside the courthouse. (See People v Huffman, 41 NY2d 29 [1976]; People v Harris, 272 AD2d 225 [1st Dept 2000]; People v Nesby, 161 AD2d 246 [1st Dept 1990].) And, since the defendant was not in custody at the time, no Miranda warnings were necessary. (See e.g. People v Centano, 76 NY2d 837, 838 [1990]; People v Yukl, 25 NY2d 585 [1969], cert denied 400 US 851 [1970].)
The defendant’s response, that he had “found” the bag inside a courtroom and was just coming back to return it, only added *1058 to the existing probable cause to arrest the defendant. After all, the Bronx Defenders employee had told Officer McGonnigle that the bag was sitting on a bench in a courtroom, and that she believed the person sitting on a bench next to the bag had taken it from the courtroom. The officer also knew that the courtroom had been searched thoroughly, that no bag had been found, and that other court officers were on hand when all the people were asked to leave. Thus, Officer McGonnigle was completely justified in discrediting the defendant’s statement and taking him into custody at that time.
The subsequent extensive search of the items inside defendant’s knapsack and the search of the defendant’s wallet were both proper as they were performed contemporaneous with and incident to the defendant’s arrest. (People v De Santis, 46 NY2d 82, 87 [1978], cert denied 443 US 912 [1979]; People v Raily, 309 AD2d 604 [1st Dept 2003]; People v Wylie, 244 AD2d 247, 249-250 [1st Dept 1997].) The statements that the defendant made while in the holding cell after his arrest are also admissible. The defendant was obviously in custody at the time.[3] However, the statements were spontaneous and not the result of interrogation. (See e.g. People v Singer, 228 AD2d 346, 347 [1st Dept 1996].) Accordingly, the defendant’s motions to suppress the physical evidence recovered in this case and his motion to suppress his statements are denied in their entirety.
After fully cross-examining Officer McGonnigle, and during closing arguments, the defendant moved to preclude the People from introducing the statement he made while at the magnetometer. He argued that he had not been given proper notice of that statement, as he received notice only that the People intended to introduce statements he made while in custody, at about 2:35 p.m. The People gave notice that the sum and substance of those statements was that the defendant had found the purse in the courtroom, that he had been the last one in the courtroom, and that he was bringing it back. The defendant made statements at the time noticed which were substantially similar to the ones he had made to the same court officer about 45 minutes earlier. Moreover, he received a full hearing dealing with the admissibility of all the statements. Accordingly, since *1059 “any alleged deficiency in the notice provided by the People [is] irrelevant,” the motion to preclude is denied (People v Kirkland, 89 NY2d 903, 905 [1996]; see also People v Figueras, 199 AD2d 409, 410 [2d Dept 1993]).

. The building actually houses courtrooms, chambers, and clerical offices for the Family Court as well as the Criminal Court. In addition, the Bronx District Attorney’s Office, the Legal Aid Society Juvenile Rights Division, the New York City Law Department, the Department of Probation, and other agencies all have space in the building. Although the “magnetometer stations” in this case stand at the entrance for the Bronx Criminal Court, an individual passing through that entrance would have access to the Family Court as well as floors containing offices of the other agencies.

. Ironically, the defendant told the officer that he had been in a courtroom in the building earlier that day, and he had obviously left the building. Thus, he had to have gone through the same security procedures the first time he entered the building, and can hardly claim that he was personally unaware of the search protocols on his return.

. The People did not elicit the substance of the so-called Miranda warnings read by Officer McGonnigle prior to the defendant making these statements, and the court makes no findings about whether the warnings were complete or adequate.