OPINION OF THE COURT
Michael Gerstein, J.
This Mapp/Dunaway hearing requires the court to apply the recent U.S. Supreme Court ruling in Riley v California (573 US *174 —, 134 S Ct 2473 [2014]) to the inspection of photographs contained on defendant’s cell phone and reviewed after a court officer observed defendant apparently taking a photograph in the courthouse in violation of court rules. Defendant is charged with two counts of criminal contempt in the second degree (Penal Law § 215.50) for the use of his cell phone in the court to take pictures. Defendant has moved for suppression of the cell phone at issue and the pictures recovered from the phone. Riley holds, in essence, that no search may be conducted of an arrestee’s cell phone incident to a lawful arrest without first obtaining a search warrant. Here, the People propose various theories to avoid that holding, but the court finds none of those rationales persuasive, and grants defendant’s motion to suppress photographs recovered from defendant’s cell phone.
Facts
The People called two witnesses at the hearing, Court Officers Robert Brusco and Adam Cantor. While there were some discrepancies between them, the court credits their testimony. The defendant did not call any witnesses.
This case involves events that transpired during the trial of Nechemya Weberman, charged with raping a 12-year-old girl, presided over by the Honorable John Ingram in Part 21 of Supreme Court, Kings County, in November 2012 (People v Weberman, Sup Ct, Kings County, Nov. 27, 2012, Ingram, J, No. 1589/11).
On November 27, 2012, Justice Ingram explicitly admonished the members of the Weberman courtroom audience: “I remind all spectators no tweeting, no blogs, make sure everybody’s phone is off. You can’t have any direct communication with anybody outside the courtroom.” (Defendant’s exhibit A, tr of Weberman trial at 93.) However, Justice Ingram stated shortly thereafter, “[y]ou can step and do whatever you want outside the courtroom.” (Id.)
Officer Brusco testified that he was assigned to secure the Part 21 audience during the Weberman trial. (Brusco tr, June 11, 2014, at 4, lines 8-10; at 21, line 7.) On November 28, 2012, he observed Yona Weissman, defendant herein, and Joseph Fried sitting in the Part 21 audience, and he observed defendant with a cell phone in his hand, approximately placed at his waist and to his side. (Brusco tr, June 10, 2014, at 12, line 17 through 13, lines 9-13.) Officer Brusco believed that the cell phone was on, as its cover was open and the screen and keypad were il *175 luminated. (Id.) Upon Officer Brusco’s approach, Fried nudged defendant, who immediately put his phone away. (Brusco tr, June 11, 2014, at 23, lines 23-25.) Significantly, there was no testimony that Officer Brusco thought defendant was using his phone to take pictures.
On the following day, November 29, 2012, Officer Cantor was assigned to a security desk post outside Justice Ingram’s courtroom for lunch relief, approximately 11:30 a.m. through 1:00 p.m. (Cantor tr, June 13, 2014, at 8-10.) Officer Cantor testified that he interacted with Weissman on three separate occasions on that day, advising Weissman on each occasion, in substance, that the Part 21 courtroom was already filled to capacity, and that Weissman would have to wait for other spectators to leave before he could enter. After the third interaction, he observed Weissman and his companion proceed to the elevator area, and, from that location, hold their cell phones in such a manner that they appeared to be using the phones to photograph Officer Cantor. (Cantor tr at 12-16.) Any such photography, whether in the hallway or any other location within the courthouse, and whether of Officer Cantor or not, constituted a violation of 22 NYCRR 29.1 (a), which, with exceptions not applicable herein, prohibits photography or recordings of any nature in the entire courthouse as follows: “Taking photographs ... in a courthouse including any courtroom, office or hallway thereof, at any time or on any occasion ... is forbidden.”
Officer Cantor verbally directed defendant and his companion to come over to the security desk where he was seated. (Cantor tr at 17, lines 7-8.) They immediately, and without protest, complied. It is undisputed that no guns were drawn, and no force, threats or promises were made. Moreover, it appears that Officer Cantor at this point had not even risen from his seat at the security desk. Specifically, Officer Cantor testified as follows:
“A. I asked them [defendant Weissman and his companion] to come over to me with their phones out and let me see the pictures on their phones . . .
“Q. How did you ask them that?
“A. I said ‘Come over here with your phones out, let me see the pictures in your phones.’ ” (Cantor tr at 17, lines 1-8.)
“Q. Did you accuse them of taking pictures of you?
“A. I believe what I said to them was: ‘Let me see *176 the pictures in your phone, come over here,’ something to that degree.
“Q. So you didn’t even ask them if they took photographs of you?
“A. I asked them when they came over to me, yes. “Q. You just testified that you told them to show you the pictures in their phone, correct?
“A. Yes, I said something to that degree, ‘let me see your phones, come over here with your phones,’ something like that.
“Q. And they both handed you their phones?
“A. No.
“Q. They didn’t give you their phones?
“A. No.
“Q. You took their phones?
“A. No, they showed me the pictures in their phones holding their own phones.
“Q. But at your direction, correct?
“A. Yes.” (Cantor tr at 60, lines 10-25 through 62, lines 1-4.)
“Q. When Mr. Weissman showed you the photos on his phone, he showed you one image at a time, is that correct?
“A. Yes.
“Q. So the first image that he showed you was not an image of you, correct?
“A. Yes.
“Q. So you were able to tell that he did not in fact take a picture of you, correct?
“A. I knew that that wasn’t me, yes, but I told him to scroll through it, I didn’t know what he might have done on the way to me.
“Q. I see. So the first image wasn’t you, you wanted to make sure that the second and all subsequent images weren’t of you as well, correct?
“A. Correct. . .
“Q. So even though the first image was not of you, you didn’t say ‘put your phone away’?
“A. No.” (Cantor tr at 62, line 7 through 63, line 1.)
“Q. So after the second image, you were able to tell that the second image was also not you, correct?
“A. Yes, I was able to tell it wasn’t me.
*177 “Q. In fact, there were no images of you in either of their [defendant and his companion’s] phones, correct?
“A. Correct.” (Cantor tr at 63, lines 19-24.)
After scrolling through the phone, Officer Cantor observed a photograph of a young woman testifying from the witness stand. Knowing that the Weberman trial concerned an alleged rape of a young girl, Officer Cantor recovered two cell phones from the men, entered Part 21 and approached Officer Brusco. (Cantor tr at 29, lines 1-4; at 31, lines 1-11.) Officer Cantor told Officer Brusco that he believed defendant and Fried had taken his photograph in the hallway of the courthouse. (Cantor tr at 31, lines 1-3.)
Officer Brusco entered the hallway, and asked the defendant to show him (Officer Brusco) the contents of the iPhone. (Brusco tr, June 11, 2014, at 43, lines 8-11.) Officer Brusco had both individuals unlock their phones so as to gain access to the pictures stored on them. Defendant complied with Officer Brusco’s demand. When Officer Brusco reviewed the pictures on defendant’s cell phone, he observed a photograph depicting the Weberman complainant situated on the witness stand in Part 21. Other pictures of people situated inside the courtroom and of people in the hallway of the courthouse were also observed. (Brusco tr, June 11, 2014, at 53, lines 3-12.) Officer Brusco could not recall whether Officer Cantor had already seen the pictures of the victim on the stand. After viewing the pictures, none of which depicted Officer Cantor, Officer Brusco deleted from both phones all of the images apparently taken in the courthouse. (Brusco tr, June 11, 2014, at 54, lines 7-15.)[1]
Diminished Expectation of Privacy in a Courthouse
The Fourth Amendment provides, in pertinent part, “[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated.” (US Const Amend IV) The Fourth Amendment protects people against unreasonable searches and seizures where individuals have a reasonable expectation of privacy. (Katz v United States, 389 US 347, 360-361 [1967, Harlan, J, concurring].) In assessing reasonableness, courts balance society’s interest in the intrusion against the individual’s privacy interests. “What a person knowingly exposes to the public, even in his own home or office, *178 is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.” (Id. at 351-352 [Stewart, J.] [citations omitted].)
However, the courthouse has long been held to be a special place for Fourth Amendment purposes. A search that is unreasonable in public may be entirely reasonable in the courthouse. Society has a compelling interest in protecting the public in certain areas, like courthouses, and this interest justifies a search despite the absence of a warrant. (People v Rincon, 177 AD2d 125, 127 [1st Dept 1992]; Matter of Bozer v Higgins, 204 AD2d 979, 980 [4th Dept 1994]; accord People v Spalding, 3 Misc 3d 1052, 1055 [Crim Ct, Bronx County 2004] [“There is a ‘compelling governmental interest’ to protect the public ‘in courthouses . . .’ Therefore, mandatory, limited searches of visitors entering public buildings, such as courthouses, have become the rule” (citation omitted)]; see also Legal Aid Socy. of Orange County v Crosson, 784 F Supp 1127, 1131 [SD NY 1992] [“(T)he governmental interest in safeguarding courthouses is paramount”].)

Riley v California

Applying a Fourth Amendment analysis to searches of cell phones incident to lawful arrests, the United States Supreme Court recently held that “a warrant is generally required before such a search, even when a cell phone is seized incident to arrest.” (Riley, 573 US at —, 134 S Ct at 2493.)[2] Specifically, Riley announced that while the potential of harm to officers and the potential destruction of evidence are typically present in all custodial arrests, “[t]here are no comparable risks when the search is of digital data.” (573 US at —, 134 S Ct at 2485.)
In reference to potential harm being inflicted upon officers, “[d]igital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee’s escape.” (573 US at —, 134 S Ct at 2485.) In other words, “[o]nce an officer has secured a phone and eliminated any potential physical threats . . . data on the phone can endanger no one.” (573 US at —, 134 S Ct at 2485; cf. United States v Robinson, 414 US 218 [1973] [unknown physical object inside a cigarette packet justified a warrantless search]; Rincon *179 [a visitor to a courthouse impliedly consents to the search of a paper bag inside his waist pouch after he triggers the alarm of a metal detector and thereafter places the pouch on a table for the officer’s inspection].) In our case, the People do not seek to justify their search based on any threat of physical harm.
While the Court has recognized that searches incident to arrests do not justify a warrantless search of cell phone data, “other case-specific exceptions may still justify a warrantless search of a particular phone.” (Riley, 573 US at —, 134 S Ct at 2494.) For example, exigent circumstances may “make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.” (573 US at —, 134 S Ct at 2494; see United States v Chadwick, 433 US 1, 15 n 9 [1977] [“if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon”]; United States v Johnson, 467 F2d 630 [2d Cir 1972] [police officers, who had been informed that suitcases belonging to defendant, who had been arrested and taken to police station for questioning as to possible involvement in robbery in which sawed-off shotgun was used, could be found near rear door of apartment building in high crime area, were justified in seizing suitcases without first procuring warrant; and, having probable cause to believe that suitcase contained contraband sawed-off shotgun, officers were not required to carry suitcases unopened to police station to obtain warrant but could, without violating Fourth Amendment, open suitcases].)
Riley also analyzed and held that interests in preventing the destruction of data stored on a cell phone do not constitute exigent circumstances sufficient to dispense with the necessity for a search warrant. First, the Court held that loss of evidence within the reach of a defendant is not present in the context of a cell phone, because “once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone.” (Riley, 573 US at —, 134 S Ct at 2486.) Furthermore, in the context of the potential to remotely wipe a cell phone’s contents, the Court held that “law enforcement is not without specific means to address the threat.” (573 US at —, 134 S Ct at 2487.) Specifically, remote wiping can be prevented by turning the cell phone off or removing its battery. (573 US at —, 134 S Ct at 2487.) If law enforcement is concerned about encryption *180 or other potential problems, the phone can be left on and placed in an enclosure that isolates the phone from radio waves. (573 US at —, 134 S Ct at 2487.)
“It is a basic premise of the law of search and seizure that police-initiated intrusions must be justified at their inception.” (People v Packer, 49 AD3d 184, 185 [1st Dept 2008].) The results of a search cannot excuse any illegality in its conduct. (See People v De Bour, 40 NY2d 210, 216 [1976].) The Court of Appeals in People v De Bour established a four-tiered analysis for evaluating encounters initiated by the police. De Bour provides guidance for the requisite suspicion needed for each type of encounter. Level one, the minimal intrusion of approaching to request information, is permissible when there is some objective credible reason for that interference. (40 NY2d at 223.) Level two, the “common-law right to inquire,” requires a “founded suspicion that criminal activity is afoot.” (Id.) The knowledge and reasonable inferences of the officer are considered in determining the validity of the officer’s alleged “founded suspicion.” (Id. at 216.) Level three encompasses forcible stops and requires an officer to have a “reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor.” (Id. at 223.) The fourth level maintains that an arrest is warranted when an officer “has probable cause to believe that person has committed a crime, or offense in his presence.” (Id.)
An encounter between an individual and a police officer becomes a seizure when, in view of all the circumstances surrounding the incident, a reasonable person would not “feel free to decline the officer [’s] requests or otherwise terminate the encounter.” (Florida v Bostick, 501 US 429, 434, 436-437 [1991] [“(T)he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would ‘have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business’ ”].) Whether a seizure, in fact, occurred depends on the surrounding circumstances of a specific situation. Factors that might suggest a seizure include:
“the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person’s personal effects, such as airplane tickets or identification; and a *181 request by the officer to accompany him to the police station or a police room.” (United States v Glover, 957 F2d 1004, 1008 [2d Cir 1992] [citations omitted].)
The United States Supreme Court has repeatedly held that “a search conducted without a warrant issued upon probable cause is ‘per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.’ ” (Schneckloth v Bustamonte, 412 US 218, 219 [1973] [emphasis omitted], quoting Katz v United States, 389 US 347, 357 [1967]; see also Stoner v California, 376 US 483, 486 [1964]; accord People v Alba, 81 AD2d 345, 350 [1st Dept 1981].) One such exception to the warrant requirement is when the search is voluntarily consented to. Police need not procure a warrant for a search when they have obtained the “voluntary consent of a party possessing the requisite authority or control over the premises or property to be inspected.” (Alba, 81 AD2d at 351.) However, where the circumstances “objectively reveal overbearing official conduct in obtaining an apparent consent,” that consent is not voluntary and the evidence collected as a result of that consent must be suppressed. (People v Gonzalez, 39 NY2d 122, 124 [1976].) “Official coercion, even if deviously subtle, nullifies apparent consent.” (Id.) The burden to prove that consent to search was voluntarily given is a heavy burden that rests on the prosecution, “and that burden is even greater when there is ample opportunity to obtain a warrant.” (People v Perez, 37 Misc 3d 734, 739 [Sup Ct, Kings County 2012]; see People v Skardinski, 24 AD3d 1207, 1208 [4th Dept 2005] [where People failed to meet their “heavy burden of proving the voluntariness of the purported consent”].)
Determining whether consent is voluntary hinges on four factors: (1) whether the defendant is in custody or under arrest, and the circumstances surrounding the custody or arrest; (2) the background of the consenter; (3) whether the consenter has been, previously to the giving of consents, evasive or uncooperative with law enforcement authorities; and (4) whether defendant was advised of his right to refuse to consent. (Gonzalez, 39 NY2d at 128-130.)
Discussion
A. Consent
Officer Cantor had a founded suspicion that 22 NYCRR 29.1 had been violated based upon his seeing defendant holding his *182 cell phone near his chest and in such a manner that Officer Cantor believed that defendant was photographing him. (Cantor tr at 16, lines 3-16; see People v Rosemond, 26 NY2d 101 [1970] [observation of defendant and another entering apartment building empty-handed and exiting carrying suitcase and shopping bag warranted inquiry].)
Accordingly, Officer Cantor was authorized to investigate his suspicions by stopping defendant Weissman, and engaging in what De Bour labels as a common-law right of inquiry. Although Officer Cantor was not investigating a crime, but only a violation of court rules for which no criminal or other penalty may be imposed, that is a distinction without a difference in that the courthouse is a special place where a diminished expectation of privacy exists.[3] Officer Cantor thus had sufficient grounds to satisfy, at the least, both level one and level two of De Bour.
Furthermore, as uniformed members of the Unified Court System, peace officers are responsible for the security in the courthouse. Peace officers, such as Officer Cantor, have “[t]he power to carry out warrantless searches whenever such searches are constitutionally permissible and acting pursuant to their special duties.” (CPL 2.20 [1] [c].) The special duties of a peace officer, in performing the duties of his office, authorize Officer Cantor “to enforce any general, special or local law or charter, rule, regulation, judgment or order.” (CPL 2.20 [2].) Thus, Officer Cantor properly and legally approached defendant on the founded suspicion that he was in violation of 22 NYCRR 29.1.
The courthouse is an environment where persons have diminished expectations of privacy. Court officers constantly patrol the courthouse, ensuring safety, order, and that visitors are in compliance with courthouse etiquette. Much behavior which would be perfectly appropriate in the street is forbidden in the courthouse. This is not only for reasons of security, which of course are paramount, but also to maintain a sense of decorum appropriate for the conduct of formal legal proceedings. *183 Thus, the court may regulate such actions as the manner of dress (e.g. by prohibiting the wearing of shorts, revealing tops and other inappropriate garments, and hats by men, with exceptions for religious observances), distribution of leaflets, demonstrations, entry into various restricted areas, as well as usage of cell phones and other electronic devices. In this regard, it is notable that the United States District Courts for both the Southern and Eastern Districts of New York, as do many other courts, prohibit spectators from bringing cell phones and other electronic devices into their entire courthouses (not just courtrooms) unless special permission is granted.[4]
Restrictions inside the courtroom, stricter than those applying to other areas of the courthouse, are also properly imposed and enforced. Thus, sessions of the court are typically opened by an announcement by a court officer with a list of prohibitions, including an admonition that cell phones are not to be used or displayed in the courtroom. On the other hand, unlike our federal courts, our state courts, including Supreme Court, Kings County, have no rule prohibiting use of cell phones or electronic devices such as laptop computers in the hallways of the courthouse, and do not prohibit possession of cell phones in the courtroom.
While the rules of court, whether for purposes of security or merely to maintain an appropriate level of decorum, may be fully enforced by our court officers, this court may take judicial notice that spectators, for varying reasons, do not uniformly adhere to all of the rules. In Kings County Criminal Court, for example, it is not unusual to observe spectators and defendants in the courtroom waiting for their cases to be called to be engaged in conversation, to be asleep, to enter the courtroom wearing a cap or other prohibited headgear, or to take out and/or fail to turn off their cell phones. Such behavior is routinely handled by a court officer advising them to cease their improper actions, and such verbal warnings are generally, if not universally, sufficient to stop the offending behavior.
*184 But just as a reasonable courtroom spectator free of any wrongdoing, even if admonished by a court officer for improper behavior, would not feel he or she was in custody and would feel free to leave, this court holds that a reasonable person would not feel free to ignore the directive of a court officer, addressed to him or her personally, and not just to the collective audience, whether in the courtroom or the courthouse. A reasonable person free of wrongdoing, knowing that he or she was going into a special place with diminished privacy expectations, would rightfully believe that he or she was required to follow directions of court officers within the courthouse, personally delivered to him or her.[5]
This court holds that a reasonable person, free of any wrongdoing, would not have felt free to ignore Officer Cantor’s direction to come over and show the Officer his phone. Just as there is a diminished expectation of privacy in the courthouse, this court holds that there is a diminished expectation for a spectator in the courthouse to behave however one wishes so long as no laws are being violated. Thus, this court holds that defendant’s consent for Officer Cantor to view the pictures was compelled, and not freely given. Defendant was not given any option as to whether to show the pictures, and it is clear from Officer Cantor’s testimony that his tone towards defendant, following three prior interactions within a period of less than 90 minutes, was not that of a request, but a demand which a reasonable person, free of any wrongdoing, would not have felt free to refuse.
Defendant’s purported consent was not “a true act of the will, an unequivocal product of an essentially free and unconstrained choice.” (Packer, 49 AD3d at 187 [defendant prevented from retrieving his backpack, and, as a result, prevented from terminating his encounter with the police officer]; see also *185 People v Springer, 92 AD2d 209, 212-213 [2d Dept 1983].) Thus, defendant’s consent is nullified.[6] However, we do not hold that consent can never be given to a court officer in the courthouse or the courtroom. Our holding in this regard is limited to the unique facts of this case.
B. The Special Needs Doctrine and Panoply of Facts
The People, relying on MacWade v Kelly (460 F3d 260 [2d Cir 2006]), argue that the limited search of defendant’s cell phone may be justified as reasonable under the special needs doctrine applicable to the courthouse, in that the government’s interest in conducting the search outweighs the defendant’s interest in avoiding the search. This court agrees with the People’s argument that Officer Cantor’s initial investigation was proper, although he was not investigating criminal activity, but merely a possible breach of a court rule which he was required to enforce, specifically the rule against photography in the courthouse.[7] Moreover, it was also proper for Officers Cantor and Brusco to seize defendant’s phone.[8]
Assuming arguendo that it was permissible, as part of Officer Cantor’s investigation, to require defendant to show Officer Cantor any pictures on his phone, Officer Cantor did not stop when he saw that the first several photos on defendant’s phone were not of him, and not taken in the courthouse. Rather, Officer Cantor had to go through at least two, and possibly three, photos on defendant’s phone, none of which were of him, and none of which appeared to be taken in the courthouse, until he reached photos which appeared to be those of a witness in the act of testifying. (Cantor tr at 63.)
Riley governs under these facts. Assuming arguendo that the special needs exception permitted Officer Cantor to direct defendant to show him any pictures in his phone based upon Officer Cantor’s belief that defendant might have taken a *186 picture of him in the hallway,[9] his search was not so circumscribed as to gain approval from this court. Once Officer Cantor determined that the initial pictures he saw on defendant’s phone were not of him, did not appear to have been taken in the courthouse or any other location prohibited by rule, and did not exhibit evidence of any wrongdoing, Riley prohibits him from proceeding further as he in fact did, by scrolling through additional pictures on defendant’s phone without having first obtained a warrant.
Officer Cantor’s explanation, and the People’s argument, that he wanted to make sure defendant had not jumbled the order of the pictures on his phone while walking over to the security desk, was squarely rejected by the Supreme Court. While it may be argued that an exception might be created if there was a specific reason articulated to believe that defendant was attempting to delete or jumble cell phone data before the phone could be examined, there was no such testimony by Officers Cantor or Brusco, and this court need not rule on such a hypothetical situation. Officer Cantor had defendant under constant observation from the time he saw what he believed to be defendant using his phone to take the Officer’s picture until he seized defendant’s phone. He had ample opportunity to observe whether defendant was engaging in any maneuvers to jumble the order of the pictures or to delete any pictures. Riley explicitly rejects the argument that a warrantless search of cell phone data may be conducted based solely on the mere possibility that the data may be deleted prior to the time a warrant may be obtained.
The People argue that the search here was, at most, a limited intrusion, in that Officer Cantor did not actually seize defendant’s phone, and did not examine any data from the phone other than the photographs stored therein. (See People’s mem at 13-16.) While it is clear that the actions of Officer Cantor did not constitute a complete search of defendant’s phone data, it appears that the police in Wurie, the companion case decided with Riley, limited their search held improper by the Supreme Court to “pressing] one button on the phone to access its call log, then another button to determine the phone number associated with the ‘my house’ label.” (573 US at —, 134 S Ct at 2481.) The fact that a search is less than complete does not vitiate any *187 illegality of that search. Thus, it is of no moment that Officer Cantor did not search all of the data within defendant’s phone, or even all of the photographs. Even assuming arguendo that after Riley he had grounds for any warrantless search at all, once he determined that the initial photos on the phone were not of him, and contained no evidence of criminality or of any violation of court rules, Riley mandates that his warrantless search of the phone terminate. Thus, however “minimal” one may characterize the search and intrusion, it was not sufficiently minimal to comport with the Supreme Court’s application of the Fourth Amendment in Riley. And, as discussed above, it may not be justified based on consent, as defendant’s consent must be deemed to have been compelled.
Nor does the plain view doctrine rescue the search. While it might be arguable that the.plain view doctrine would have been applicable if the offending photo was visible as soon as Officer Cantor looked at defendant’s phone, or perhaps even if it was the first picture shown to Officer Cantor, here he required defendant to scroll through several pictures, none of which were of him or the courthouse, before discovering the photo believed to be that of the complainant in the Weberman trial. This is not what is meant by “plain view.” Rather, the photos at issue were not in view—plain or otherwise—until defendant, at Officer Cantor’s direction, first scrolled through several other photos.
Only brief discussion is required of the second search, by Officer Brusco. The only basis for the search was the photos which Officer Cantor found, together with defendant’s verbal consent, which we have held not to be voluntary. Therefore, any consent given to Officer Brusco, a few minutes later, is no better than that given initially to Officer Cantor.
C. There was No Attenuated Probable Cause
The People argue that Officer Brusco’s seizure of defendant’s cell phone was proper as incident to defendant’s lawful arrest because Officer Brusco’s independent probable cause was attenuated from any alleged improper conduct. (See People’s mem, point II.) The gravamen of the People’s argument is that Officer Brusco had probable cause to arrest defendant for displaying his cell phone in court on November 28, in violation of Justice Ingram’s admonition that all cell phones were to be turned off and put away. (Id. at 20 and citations contained therein.)
The court declines to accept that argument. Although not controlling, it is first notable that defendant was not arrested or even stopped for questioning as a result of having his phone out *188 and open in Justice Ingram’s courtroom, but rather was arrested for having a picture of the Weberman complainant on his cell phone, found after a search of his phone as discussed at length above. More important, as a matter of law, is whether there was probable cause to arrest defendant for the mere display of his cell phone in court on November 28. The only law which the People assert to have been violated by that action is Penal Law § 215.50 (3), criminal contempt in the second degree, which requires proof of “[i]ntentional disobedience or resistance to the lawful process or other mandate of a court.”
While the hearing testimony demonstrated that defendant had his cell phone out in Justice Ingram’s courtroom, the proof as to whether he did so in “intentional disobedience or resistance” was sparse at best. The testimony of Officer Brusco was contradictory as to whether defendant was actually in court when Justice Ingram admonished the audience with regard to cell phone usage. In this regard, Officer Brusco first testified as follows:
“Q. Now prior to that point [when Officer Brusco observed defendant holding an open cell phone] had you seen Mr. Weissman in the courtroom when Justice Ingram ordered members of the audience to keep their phones off?
“A. Prior to that day—
“Q. Prior to that time when he was in the courtroom?
“A. To that time, I don’t recall.” (Brusco tr, June 10, 2014, at 13, lines 14-19.)
Later in his testimony, however, Officer Brusco stated, contrary to his prior testimony, that he had seen defendant present in court on November 28 when Justice Ingram admonished the audience against the use of cell phones in the courtroom. (See Brusco tr, June 10, 2014, at 33, line 18 through 34, line 11.)
But, on cross-examination, Officer Brusco reiterated that he could not say that defendant ever heard Justice Ingram’s admonishment as follows:
“Q. And you don’t recall seeing Mr. Weissman in the courtroom during that admonishment, correct?
“A. Not personally, no.
“Q. I’m sorry?
“A. No.” (Brusco tr, June 11, 2014, at 36, lines 3-7.)
In addition, while the hearing minutes from November 27, 2012, which include Justice Ingram’s cell phone admonition, *189 were introduced into evidence, there was no testimony that defendant was in court to hear those admonitions on November 27, nor were any minutes introduced from November 28, the day defendant was observed by Officer Brusco with his cell phone open, although Officer Brusco did testify to the effect that Justice Ingram gave a similar admonishment at the opening of court each morning and afternoon during the Weberman trial.
Even assuming arguendo that the People had presented more compelling evidence that defendant had heard Justice Ingram’s admonition, or was subject to contempt even if he had not personally heard it, the People would still have to prove that defendant’s actions constituted “intentional,” rather than inadvertent, disobedience or resistance.
Here, the testimony was far short of demonstrating that defendant’s actions in having his cell phone out and open amounted to intentional disregard of Justice Ingram’s admonition. Officer Brusco testified that upon observing defendant with a small flip phone open by his hip, he motioned to defendant to shut off the phone. In addition, defendant’s companion, upon seeing Officer Brusco coming over, nudged defendant and motioned to him to shut off the phone, which defendant promptly did.
Officer Brusco testified as follows:
“A. He [defendant] was sitting next to another gentleman, who first—he was the one who noticed me coming over and motioned to him to shut his phone.
“THE COURT: ‘He’ being the other gentleman?
“THE WITNESS: Yes, sir.
“THE COURT: To make sure I understand this correctly, before you motioned to him to put away his phone, the person with whom the defendant was sitting—
“THE WITNESS: Saw me coming.
“THE COURT: Saw you coming and motioned to the defendant to put away his phone?
“THE WITNESS: Yes, and nudged him.
“Q. And then what happened after defendant was nudged?
“A. They both looked at me and I said, ‘Shut the phone and put it away,’ and they did. I’m sorry, he did.
*190 “Q. When you say ‘put it away,’ what do you mean by that?
“A. He closed it, closed the flip phone, and put it in his pocket.” (Brusco tr, June 10, 2014, at 14, lines 2-19.)
The court finds this testimony insufficient to demonstrate intentional disregard of Justice Ingram’s cell phone admonition. Defendant’s actions in having his phone out are equally referable to inadvertence, or simply not recalling that cell phones were not to be displayed if he in fact was present when Justice Ingram so stated.
Justice Ingram himself noted that he observed a reporter’s phone go off in the courtroom, and the reporter go out in the hall to take the call. (See exhibit A, tr of court proceedings, Nov. 27, 2012, at 169.) This court may also take judicial notice of the many instances where spectators or defendants in the courtroom waiting for their cases to be called leave their phones on so that the ringing from incoming calls is audible throughout the courtroom, or take out their phones in violation of instructions that phones are to be shut off and not visible. When the phone is promptly put away, or an offender leaves the courtroom, that is generally the end of the matter.
Accordingly, we cannot find probable cause to arrest defendant for contempt based upon him having his cell phone briefly out and open in the courtroom on November 28. There is insufficient proof both that defendant had personal notice of Justice Ingram’s cell phone admonishment, and that defendant willfully or intentionally, as opposed to inadvertently, violated it.
Given our finding as to the lack of probable cause to arrest defendant for having his phone out and open in court on November 28, it is unnecessary for us to determine if that was sufficiently attenuated from the review by Officers Cantor and Brusco of the photos on the phone the following day to permit a search of the phone.
The People next claim that even if Officer Brusco’s observation of defendant in the courtroom with his phone out is held insufficient to establish probable cause for arrest, certain other facts, taken together, sufficed to establish the requisite probable cause. (See People’s mem at 25.) These “other facts” are claimed to include: (a) Officer Cantor telling Officer Brusco that Officer Cantor thought that defendant was taking his picture in the hallway; (b) Officer Cantor telling Officer Brusco that he had *191 seen on defendant’s phone a picture of a witness on the stand, which Officer Brusco, upon viewing the picture, confirmed was that of the Weberman complainant; (c) Officer Brusco being able to confirm, upon seeing the picture, that it “appeared to be from the same area that he had seen defendant and [his companion] sitting in the courtroom’s spectator section the day before”; (d) Officer Brusco having seen defendant’s companion nudging defendant as Officer Brusco approached to tell him to put his phone away; and (e) the court’s oral order against usage of cell phones. (See People’s mem at 25-26.)
This court disagrees. First, this court has already held that Riley requires us to suppress the photo of the complainant recovered from defendant’s phone. Accordingly, the People may not use that photo through the back door as part of their panoply of “other facts” to justify an arrest. After taking away the photo, the remaining “other facts” relied upon by the People are insufficient to justify arrest.
The People next argue that even if those “other facts” are insufficient, they are made sufficient by the additional fact that the Officers observed the same photo of the Weberman complainant on the phone of defendant’s companion, in that defendant lacks standing to assert the companion’s Fourth Amendment rights. (See People’s mem at 27-30.) The flaw in this argument is that the search of the phone of defendant’s companion was carried out simultaneously with that of defendant’s phone, and, under Riley, was equally improper and violative of the Fourth Amendment. While the People cite cases holding that the fruits of an improper search of one person may be used against a second person who lacks standing to assert the illegality of the search, the improper search here was, for all intents and purposes, a single, simultaneous search of both phones, that of the defendant and that of his companion. The People’s argument would largely eviscerate the Supreme Court’s rationale set forth in Riley, and would encourage the police, in a multidefendant situation, to disregard the constitutional requirements to obtain a warrant. The Fourth Amendment may not be so easily circumvented by allowing the use of the fruits of an illegal search of one defendant against the codefendant, and that of the codefendant against the defendant,[10] when the search was, in effect, a single search. (See Jones v United States, 362 US 257, 261 [1960]; People v Hansen, 38 NY2d 17, 22 [1975].)
*192 D. The Warrant
Finally, the People assert that because the People, after their search of defendant’s cell phone, subsequently obtained a search warrant based upon what they purport to be lawfully obtained information independent of their unlawful search of the phone, the search warrant was valid, and the cell phone photographs should not be suppressed. (See People’s mem at 36-40.)
It is well-settled that where a search warrant is obtained based in part on illegally obtained information, the fruits of the search need not be suppressed if the warrant application would have been sufficient after excising the illegally obtained information. (People v Arnau, 58 NY2d 27 [1982]; People v Harris, 62 NY2d 706 [1984].) Thus, when the police act illegally in obtaining evidence, “this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others.” (Arnau, 58 NY2d at 32-33 [emphasis omitted]; see e.g. People v Vonderhyde, 114 AD2d 479 [2d Dept 1985]; People v Seidita, 49 NY2d 755 [1980].)
The court has examined the warrant obtained herein. (In fact, several warrants were obtained in that the People sought to correct what may be best deemed technical defects in the initial warrant, but for convenience the court will refer to all warrants relevant to this case as though there was only a single warrant.) Upon analysis, it is apparent that the application, after parsing the illegally obtained information, to wit, the photos contained on the cell phones, and the fruits thereof, cannot be deemed sufficient to support issuance of a warrant.
Here, the application clearly stated the reason a warrant was sought as being an investigation “for surreptitiously taking photographs . . . inside the courtroom during the trial of People v. Nechemya Weberman.” The probable cause stated by the People in support of the warrant was substantially similar to the testimony at the hearing, including that the Court Officers observed the relevant photos of the Weberman complainant. However, after reciting that the initial basis for seizing the phones was Officer Cantor’s suspicion that defendant and others were taking pictures of him in the courthouse hallway, the application omitted to advise the warrant court that upon reviewing the photos, there were no such pictures of Officer Cantor. Rather, the only photos specified in the application as having been viewed by the Court Officers were those of the Weberman complainant.
*193 While the concept of severability is well-recognized in the context of search warrants and applications, “[t]here will be other instances, too, in which as a matter of principle to sustain any portion of the warrant would be fatally violative of the policy articulated in section 12 of article I of the New York State Constitution and the Fourth Amendment.” (People v Hansen, 38 NY2d 17, 21-22 [1975].)
The warrant application, signed by an assistant district attorney, specified that after Officer Cantor believed that his picture was being taken by defendant and his companion, they
“both handed [Officer Brusco] cellular telephones, that [Officer Brusco] reviewed the photographs inside these two telephones, and in the files on each of these telephones in which photographs are stored, [Officer Brusco] observed photographs of the [Weberman] victim . . . and as per Robert Brusco the photo of the victim was taken while she was on the stand.” (Search warrant application para 10.)
Clearly, this portion of the application must be excised. As to the remaining portions, they rely primarily on matters which this court has already ruled either inadmissible as a matter of law, either directly or as fruits of the poisonous tree, or consist of matters insufficient on their own to support issuance of a search warrant. For example, the purported statement by defendant’s companion that the offending photographs were taken by defendant would constitute fruit of the poisonous tree, in that the Officers’ only knowledge that such photographs existed came as the result of an illegal search. After parsing the application of matters obtained in violation of constitutional rights, the remaining allegations would not have made out the necessary probable cause.
In these circumstances, it is unnecessary for this court to rule on the situation of whether an officer’s belief that someone is taking photographs in the hallway of the courthouse, without more, would be sufficient to support issuance of a warrant. Moreover, we note that the application in this case, in contrast to the hearing testimony, offered no evidentiary facts in support of Officer Cantor’s belief that such photos were taken, but merely the conclusory assertion of his belief. And here, there is no other independent, untainted source for factual allegations to support a warrant. (See Murray v United States, 487 US 533, 542-543 [1988] [“So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police’s *194 possession) there is no reason why the independent source doctrine should not apply. The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here”]; cf. 487 US at 548 [Marshall, J., dissenting] [“The strong Fourth Amendment interest in eliminating these incentives for illegal entry should cause this Court to scrutinize closely the application of the independent source exception to evidence obtained under the circumstances of the instant cases; respect for the constitutional guarantee requires a rule that does not undermine the deterrence function of the exclusionary rule”].)
While a review of the “independent source” jurisprudence applied to search warrants demonstrates that the holdings are highly fact-specific, under our facts, we are unable to say that after excising the photographs obtained from the initial warrantless search which we have held violative of the Fourth Amendment, and further excising those matters which constitute “fruit of the poisonous tree,” there is enough left in the application to provide ground for issuance of the warrant. (People v Kennedy, 75 Misc 2d 10 [Greene County Ct 1973]; United States v Soviero, 357 F Supp 1059 [SD NY 1972] [even if affidavit made probable cause without illegally obtained information, government failed to meet its burden that it still would have sought a search warrant]; see also United States v Cioffi, 668 F Supp 2d 385, 398-399 [ED NY 2009] [“It is one thing to say that there is no need to deter by suppressing evidence that would have been discovered regardless of unconstitutional conduct; it is quite another to allow the government a second chance to fix a problem that never should have arisen”].)
Conclusion
Defendant’s motion for suppression is denied as to the cell phone itself, but is granted to the extent of suppressing all photographs and other data recovered from the cell phone.

. The court was advised that the offending photo was later recovered by the FBI forensic laboratory.

. Riley was decided after testimony was closed in our hearing, but before post-hearing memoranda were submitted by counsel. Both counsel have considered and analyzed Riley in their written memoranda.

. People v Thousand (119 Misc 2d 947 [Rochester City Ct 1983]) explained that taking a picture of a courthouse is a violation of a court rule, not a crime. However, an individual’s privacy rights do not disappear merely because the issue is not strictly defined as a “crime.” (See New Jersey v T. L. O., 469 US 325, 335 [1985] [“Because the individual’s interest in privacy and personal security ‘suffers whether the government’s motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards,’ it would be ‘anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior’ ”].)

. Local Rules of US Dist Cts, SD/ED NY, local civil rule 1.8 (eff Jan. 13, 2014) (“Unless authorized to do so by an administrative order of each respective Court, no one other than Court officials engaged in the conduct of Court business shall bring any . . . cellular telephone, computer or other electronic device into any courthouse”); Matter of Personal Elec. Devices & Gen. Purpose Computing Devices, US Dist Ct, SD NY, Standing Order M10-468 (rev) (eff Feb. 26, 2014), http://www.nysd.uscourts.gov/file/forms/standing-orderelectronic-devices.

. The testimony of Officer Brusco demonstrated that the directions here included far more than those usually applicable. Thus, he testified that because of the notoriety of the Weberman trial, causing the courtroom to be filled to capacity, entry of latecomers such as defendant Weissman and his companion was controlled by court officers and could not occur until other spectators had left. Moreover, because of the nature of the case, Officer Brusco endeavored to find out whether each spectator was a supporter of either defendant Weber-man or the complainant, and proceeded to seat them in different areas of Justice Ingram’s courtroom. (Brusco tr, June 11, 2014, at 13, line 21 through 17, line 2.) In these circumstances, it cannot be said that the spectators in the audience, including defendant, would have felt free to disregard Officer Brusco to instead sit wherever they pleased.

. While not controlling, Officer Cantor forthrightly testified that if defendant had not turned over his phone, Officer Cantor would have taken it. (See Cantor tr at 29.)

. It is of no moment that Justice Ingram told the audience that they could “do whatever [they] want outside the courtroom.” Taken in context, he was clearly referring to only the permitted use of cell phones, to make phone calls or check messages, in the hall, and his statement cannot be considered a license for behavior that was illegal or violative of court rules.

. In this regard, it appears that Officers Cantor and Brusco were acting fully within the scope of both the law and administrative directions extant at the time. They cannot be faulted for failing to anticipate the Supreme Court’s subsequent Riley decision.

. Under the facts here, it is unnecessary for this court to determine whether Officer Cantor’s warrantless search of the first two or three photos on defendant’s phone passed muster under the Fourth Amendment and Riley.

. In this regard, it is notable that defendant’s companion was initially charged as a codefendant in this matter.